[No. 54246-0-I. Division One. August 22, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. JESUS C. MEZQUIA, *Appellant*.

120

*Jason B. Saunders* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Brian M. Mc-Donald, Deputy*, for respondent.

¶1 COOK, J.* — Jesus Mezquia was convicted of first degree felony murder in connection with the rape and strangulation death of Mia Zapata. Because we conclude that the trial court did not abuse its discretion in excluding "other suspect" evidence regarding Zapata's former boyfriend or in admitting DNA (deoxyribonucleic acid) evidence obtained in Florida and because the trial court's preliminary ruling regarding ER 404(b) evidence has not been properly preserved for review, we affirm Mezquia's conviction. The trial court's imposition of an exceptional sentence,

---

* Judge Susan Cook is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

however, violated Mezquia's Sixth Amendment rights and we therefore remand for resentencing.

## FACTS

¶2 In July 1993, Mia Zapata was 27 years old and the lead singer of a band called "The Gits." Around July 4, Zapata returned to Seattle from a successful West Coast tour with the band.

¶3 Zapata spent the evening of July 6 drinking with friends at the Comet Tavern, a bar that she frequented in the Capitol Hill neighborhood. At about 1:00 A.M., she left the Comet and went across the street to the apartment of a friend known as "T.V." T.V. and Zapata sang backup vocals together in another band and T.V.'s apartment was upstairs from a studio where various bands practiced. Before going up to the apartment, Zapata first checked the studio to see if her former boyfriend, Robert Jenkins, was there. She was intoxicated, angry, and frustrated that she could not find Jenkins because she wanted to talk to him about their relationship. An hour later, at about 2:00 A.M., Zapata told T.V. she was going home and left the apartment.[1]

¶4 At about 3:30 A.M., the Seattle Fire Department responded to a call reporting the body of a young female lying on the pavement of a dead-end street at 24th Avenue South between South Yesler and South Washington Streets. Zapata had no pulse and was not breathing. The paramedics' attempts to resuscitate her were unsuccessful and Zapata was pronounced dead shortly thereafter.

¶5 Zapata's sweatshirt was pulled up underneath her arms and her hood was tied tightly around her face and knotted under her throat. Her underwear, wallet and torn bra were stuffed into the pocket of her jeans. The medical examiner determined that Zapata was strangled with a ligature and concluded that the drawstring of her sweatshirt was the ligature used.

[1] Zapata left on foot. According to T.V., Zapata said she would go across the street to the cab station and take a cab home.

¶6 Zapata suffered injuries to her internal organs. She also suffered vaginal and anal injuries, consistent with rape. Zapata had many external abrasions, including abrasions along the sides of her nipples. Because the abrasions could have been caused by teeth, the medical examiner took swabs from the area.

¶7 In 1993, a Washington State patrol forensic scientist examined the swabs taken from Zapata's body. No semen was detected. However, the presence of saliva was found on the nipple swabs.

¶8 In 2001, a Seattle police detective assigned to review unresolved cases submitted the swabs to the Washington State Patrol Crime Laboratory for additional DNA analysis. A forensic scientist performed DNA work on the swabs using polymerase chain reaction and short tandem repeat methodology. She obtained two DNA typing profiles in equal concentrations on both the right and left nipple swabs: Zapata and an unknown male. No other DNA profile was obtained on any of the other material tested.[2]

¶9 In June 2002, the information concerning the unknown male profile was entered into the national DNA database. It did not match any known profiles.

¶10 Six months later, in December 2002, the Washington State Patrol was notified of a match: the DNA profile of Jesus Mezquia matched the profile of the unknown male.[3] The frequency of the profile in the United States is one in 1.5 trillion.

¶11 At the time the match was found, Mezquia resided in Florida. He was on probation following a 2002 Florida felony conviction for possession of burglary tools. As a condition of his probation, he was required to submit two cheek swab samples.

---

[2] An independent scientist with expertise in DNA analysis also reviewed the work done at the Washington State Crime Lab. He testified at trial that he concurred with the analysis.

[3] Washington police detectives later took a blood sample from Mezquia and confirmed the match.

¶12 Mezquia lived in Seattle between 1992 and 1994. He lived with a woman about a mile and a half from where Zapata's body was found. On the date of the murder, the woman he lived with was out of town.

¶13 On January 10, 2003, Seattle police detectives arrested Mezquia in Miami. After being advised of his *Miranda*[4] rights, Mezquia spoke with the police. They showed him a photograph of Zapata and he denied ever knowing or having sexual contact with her. When questioned, Zapata's friends and bandmates all said that they had never seen or heard of Mezquia.

¶14 By amended information, the State charged Mezquia with premeditated first degree murder and, alternatively, with first degree felony murder based on first or second degree rape. After a month-long jury trial, the jury convicted Mezquia of first degree felony murder.

¶15 The trial court imposed an exceptional sentence of 440 months imprisonment based on the aggravating circumstance of deliberate cruelty.[5] Mezquia appeals both his conviction and the exceptional sentence.

## "OTHER SUSPECT" EVIDENCE

¶16 Mezquia sought to present evidence that Zapata's former boyfriend, Jenkins, committed the murder. Mezquia argued that there was evidence pointing to Jenkins as the guilty party, including: (1) Zapata was angry about Jenkins' relationship with his new girl friend, (2) she expressed extreme anger and frustration towards him just prior to her death when she was at T.V.'s apartment,[6] (3) Zapata was looking for Jenkins that evening, (4) Jenkins called Zapata's roommate the next morning asking to speak with Zapata and when told she might be in the shower re-

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] Mezquia's standard range sentence was between 240 and 320 months.

[6] T.V. testified that Zapata said "I hate. I hate" without reference to a specific person. Report of Proceedings (Mar. 10, 2004) at 853.

sponded that the person in the shower probably wasn't Zapata, and (5) a friend of Zapata's said Zapata told her Jenkins sometimes went "crazy" and had attacked her a couple of times in the past.[7]

¶17 The trial court denied Mezquia's motion to present this evidence, ruling:

> [T]here is insufficient evidence, and certainly almost no admissible evidence, that would link Robert Jenkins to the killing. It is true that, at the time she left the apartment at 2 a.m. the morning she was killed, Ms. Zapata was in a rage, and she said she was going to find Robert, but there is no step taken by him that would connect him to the crime or indicate that he had any intention to act on what are said to be previous, I guess, types of violence toward her.[8]

¶18 Mezquia contends the court abused its discretion and its ruling deprived him of his right to present a defense.

■ ■ ¶19 A criminal defendant has a constitutional right to present a defense consisting of relevant, admissible evidence. *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). In order to be relevant, and therefore admissible, the evidence connecting another person with the crime charged must create a trail of facts or circumstances that clearly point to someone other than the defendant as the guilty party. *State v. Maupin*, 128 Wn.2d 918, 928, 913 P.2d 808 (1996). The evidence must establish a nexus between the other suspect and the crime. *State v. Condon*, 72 Wn. App. 638, 647, 865 P.2d 521 (1993). The defendant has the burden of showing that the other suspect evidence is admissible. *State v. Pacheco*, 107 Wn.2d 59, 67, 726 P.2d 981 (1986).

■ ¶20 The admission or refusal of evidence lies largely within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *Rehak*, 67 Wn. App. at 1 .

---

[7] C k's Papers at 50.

[8] R. ort of Proceedings (Mar. 3, 2004) at 292.

¶21 Mezquia argues that as in *State v. Clark*, 78 Wn. App. 471, 898 P.2d 854 (1995), the trail of evidence leading to Jenkins as the murderer was sufficiently strong to allow the admission of his proffered evidence at trial.[9] In *Clark*, the defendant presented evidence of the other suspect's motive, opportunity, and ability to commit the arson for which Clark had been charged. *Clark*, 78 Wn. App. at 474-76. The fire occurred in a house Clark rented for business purposes. *Clark*, 78 Wn. App. at 473. The other suspect believed Clark had an affair with his wife and had molested his daughter and was obsessed with damaging Clark. *Clark*, 78 Wn. App. at 474. The other suspect had warned his former spouse (Clark's girl friend) to "watch it" because he knew how to start fires without detection. *Clark*, 78 Wn. App. at 475. He also told her it was "too bad" Clark was in jail for something he did not do. *Clark*, 78 Wn. App. at 475. The court in *Clark* concluded the other suspect evidence was admissible because it clearly pointed to someone other than the defendant as the guilty party. *Clark*, 78 Wn. App. at 480.

¶22 Mezquia also cites *Leonard v. Territory of Washington*, 2 Wash. Terr. 381, 396, 7 P. 872 (1885). In *Leonard*, where there was no direct evidence against the defendant, and the defendant was able to show that the other suspect had a motive and opportunity to commit the crime and had previously threatened to kill the victim, the Supreme Court concluded the defendant should be able to present other suspect evidence. *Leonard*, 2 Wash. Terr. at 396.

¶23 But here, the evidence offered by Mezquia did not clearly point to Jenkins. There was no physical evidence connecting Jenkins to the crime.[10] There was no evidence that Zapata had contact with Jenkins after she left T.V.'s

---

[9] Despite the court's ruling, a significant portion of the evidence the defense wanted to introduce about Jenkins came in during the trial, such as the status of Zapata and Jenkins' relationship, her expressions of anger towards him on the night of her murder, and the fact that she was looking for him and placed a telephone call to an unknown person while at the Comet Tavern.

[10] DNA analysis ruled out Jenkins as the unknown male in the sample collected from Zapata's body.

apartment. Nor was there any evidence that Jenkins had the opportunity or a motive to commit the crime.[11] The trial court's decision to exclude the evidence was not an abuse of discretion.

## ER 404(b) EVIDENCE

¶24 Mezquia also sought to present evidence that another man, Scott McFarlane, had committed the murder. McFarlane was a cab driver who claimed to have had a relationship with Zapata. A year after Zapata died, he made some odd, incriminating statements about the murder. He was also driving a cab in the Capitol Hill area on the night of the crime. Following a pretrial hearing, the trial court ruled that the evidence sufficiently connected McFarlane to the crime and, thus, was admissible.

¶25 During the trial, after the State had rested its case, a woman, Valentina Dececco, came forward and alleged that Mezquia had assaulted her about six months after Zapata's murder. She did not report the incident at the time, but after Mezquia was charged with murder and she saw his photograph in the newspaper, she contacted the Seattle police. Dececco said that in January 1994, at around 4:30 A.M., she was leaving her apartment in downtown Seattle for an early morning jog when Mezquia approached her. Mezquia knocked her to her knees and she felt pain at her throat. Dececco rose to her feet and ran away.[12] A short time later, when Dececco returned to her apartment building, she saw Mezquia standing at the corner of her building, staring at her and masturbating.

¶26 Before the defense put on its case, it informed the court that the State had expressed its intent to introduce this evidence in rebuttal. The defense requested an "advi-

---

[11] At one point, the defense claimed that Jenkins' girl friend at the time of the crime no longer supported Jenkins' alibi on the night of the crime. But pretrial, defense counsel admitted that they had recently interviewed her and she still said she was with Jenkins on the night Zapata was murdered.

[12] Dececco claimed that the presence of two people in a nearby car allowed her to escape.

sory opinion" from the court regarding the admissibility of the evidence and, if admissible, how it could avoid opening the door to the admission of the evidence in presenting a defense.[13]

¶27 The trial court ruled that the evidence was probative of the issues of identity and plan, and the probative value of the evidence outweighed the prejudice. Therefore, the evidence was admissible under ER 404(b).[14] However, since the witness was offered as rebuttal, the court ruled it would only come in if the defense raised the issue of identity. So, if the defense presented its other suspect evidence related to MacFarlane, the State would be able to call Dececco in rebuttal because the "other suspect evidence is necessarily directed to the issue of the identity."[15]

¶28 The defense decided not to introduce the evidence related to McFarlane and the State did not introduce the ER 404(b) evidence.

¶29 Mezquia argues that the court erred in ruling that the evidence of the prior assault was admissible under ER 404(b). The State responds that because Mezquia decided not to present the other suspect evidence and the 404(b) evidence was not introduced, any error has not been preserved for appeal.

¶30 The State analogizes to *Luce v. United States*, 469 U.S. 38, 43, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). In *Luce*, the United States Supreme Court held that in order to raise and preserve for review a claim of improper impeachment with a prior conviction, a defendant must testify. The Court reasoned that it must know the precise nature of the defendant's testimony in order to properly rule on whether

---

[13] Report of Proceedings (Mar. 17, 2004) at 3.

[14] ER 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[15] Report of Proceedings (Mar. 17, 2004) at 13.

the prosecution could use a prior conviction to impeach that testimony. *Luce*, 469 U.S. at 41. Our Supreme Court followed *Luce* and held that requiring a defendant to testify and admit or face impeachment with his prior criminal conviction in order to preserve his challenge to the court's preliminary ruling admitting this evidence does not infringe on his right to testify on his own behalf. *State v. Brown*, 113 Wn.2d 520, 533-34, 782 P.2d 1013, 1021-22 (1989).

¶31 In explaining the difficulty of reviewing a preliminary ruling regarding evidence that is not admitted at trial, the *Luce* Court observed:

> Any possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling. On a record such as here, it would be a matter of conjecture whether the District Court would have allowed the Government to attack petitioner's credibility at trial by means of the prior conviction.
>
> When the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction. If, for example, the Government's case is strong, and the defendant is subject to impeachment by other means, a prosecutor might elect not to use an arguably inadmissible prior conviction.

*Luce*, 469 U.S. at 41-42.

¶32 Other jurisdictions that have considered the issue have concluded that the rationale of *Luce* applies equally to preliminary rulings regarding the admissibility of evidence under ER 404(b) and under other evidentiary rules. *United States v. Hall*, 312 F.3d 1250 (11th Cir. 2002), is illustrative. Hall was charged with the distribution and receipt of child pornography. The State expressed its intent to introduce a videotaped interview with a child victim in a pending

criminal case against Hall. Pretrial, the court ruled that taped interview was admissible under Federal Rule Evidence 404(b) to prove intent, knowledge and lack of mistake or accident, in the event that Hall asserted lack of intent as a defense. Hall chose not to assert a defense of lack of intent and the 404(b) evidence was not admitted at trial. The Eleventh Circuit Court concluded:

> [T]he record is too minimally developed to support any meaningful review of the district court's pre-trial decision about Rule 404(b) evidence. Consequently, any possible harm flowing from the district court's ruling—permitting the admission of the videotaped interview of the child in the event that Hall raised a lack of intent defense—is wholly speculative. In sum, we conclude that the district court's pre-trial Rule 404(b) ruling is not reviewable because the videotape evidence never was admitted into evidence.

*Hall*, 312 F.3d at 1258 (citation omitted). *Accord United States v. Ortiz*, 857 F.2d 900, 906 (2d Cir. 1988) (district court ruled that ER 404(b) evidence would be admissible in rebuttal if defendant claimed lack of intent to distribute drugs or that his possession was consistent with personal use, the defendant abandoned that theory and the court held that the reasoning of *Luce* applied and claim of error was unreviewable); *United States v. Johnson*, 767 F.2d 1259, 1270 (8th Cir. 1985) (Although Luce was decided under Fed. R. Evid. 609(a)(1), its logic applies with equal force to motions under Rule 404.).

¶33 Mezquia claims *Luce* is not applicable because its holding is limited to "preliminary" rulings that do not reach "constitutional dimensions." *Luce*, 469 U.S. 38 at 42-43. He points to discussion in *Luce* where the Court distinguished the facts in *Luce* from two earlier cases, *Brooks v. Tennessee*, 406 U.S. 605, 92 S. Ct. 1891, 32 L. Ed. 2d 358 (1972), and *New Jersey v. Portash*, 440 U.S. 450, 99 S. Ct. 1292, 59 L. Ed. 2d 501 (1979). In those two cases, even though the defendants had not testified, the Court reviewed their Fifth Amendment challenges to state court rulings which they claimed discouraged them from testifying. *Luce*, 469 U.S. at

42-43. He also relies on *State v. Greve*, 67 Wn. App. 166, 169-70, 834 P.2d 656 (1992), in which this court held that if the impeaching evidence flows from a constitutional violation, the defendant need not testify to preserve the argument for appeal. So, even though Greve did not testify, this court allowed him to challenge the trial court's ruling that evidence suppressed because of a Fourth Amendment violation would be admissible for impeachment. *Greve*, 67 Wn. App. at 169.[16]

¶34 Mezquia does not contend that an evidentiary ruling under ER 404(b) is a ruling that reaches "constitutional dimensions."[17] Instead, he asserts that *Luce* does not apply because the trial court's ruling was not "in limine" or preliminary. He points out that the 404(b) issue was not raised or addressed until after the State rested.

¶35 But the ruling in *Luce* also resulted from a defense motion made during trial. Nevertheless, the Court characterized it as one in limine. In so ruling, the Court said:

> "*In limine*" has been defined as "[o]n or at the threshold; at the very beginning; preliminarily." *Black's Law Dictionary* 708 (5th ed. 1979). We use the term in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.

*Luce*, 469 U.S. at 40 n.2. Here, the defense motion for an advisory opinion, made before the State sought to introduce the 404(b) evidence, falls squarely within that definition.

---

[16] Similarly, many courts have held that a defendant need not testify at trial to appeal a ruling on the admissibility of a confession because admitting an involuntary confession would violate the Fifth Amendment right against self incrimination and the due process clause of the Fourteenth Amendment. *Dickerson v. United States*, 530 U.S. 428, 433, 120 S. Ct. 2326, 2330, 147 L. Ed. 2d 405 (2000); *United States v. Chischilly*, 30 F.3d 1144, 1150-51 (9th Cir. 1994); *Biller v. Lopes*, 834 F.2d 41, 43-45 (2d Cir. 1987); *United States ex rel. Adkins v. Greer*, 791 F.2d 590, 593-94 (7th Cir. 1986); *People v. Brown*, 42 Cal. App. 4th 461, 49 Cal. Rptr. 2d 652, 658-59 (1996).

[17] And indeed, long standing authority supports the position that an ER 404(b) ruling does not present constitutional questions. *State v. Mason*, 127 Wn. App. 554, 110 P.3d 245 (2005); *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984); *See also United States v. Hall*, 312 F.3d 1250, 1258 n.9 (11th Cir. 2002).

¶36 Mezquia also argues that the concerns raised in *Luce* about the speculation required to review the admissibility of evidence not actually admitted at trial are not present in this case. He claims the record clearly establishes that his decision not to admit the McFarlane evidence was based on the court's ruling and not on other strategic reasons. He also argues that this court would not have to speculate about whether the State would have admitted evidence of the Dececco assault in rebuttal because the State said it intended to do so.

¶37 This argument ignores the focus of a reviewing court's inquiry when an evidentiary error under ER 404(b) is alleged. Such errors are not of constitutional magnitude and do not result in automatic reversal. Instead, if an error is found, the reviewing court must then determine, within reasonable probability, whether the outcome of the trial would have been different but for the error. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984).

¶38 Here, there was no offer of proof of what McFarlane's testimony would have been.[18] Nor do we know whether the State, after hearing the other suspect testimony, would have changed its mind and decided not to present the ER 404(b) evidence. It is also possible that, after hearing the other suspect evidence, the court would have altered its ruling. Additionally, it is impossible to judge what the impact of Dececco's testimony would have been; what the defense would have asked her on cross-examination; or what, if any, limiting instruction would have been given. In sum, without a complete record, a reviewing court is unable to determine the impact of the ER 404(b) evidence as required.

¶39 The reasoning in *Luce* applies to the trial court's preliminary ruling regarding the admissibility of ER 404(b) evidence. Because the evidence was not admitted, the

---

[18] Initially, the defense was unable to find McFarlane and because he was unavailable, sought to admit his hearsay statements as statements against penal interest. McFarlane was located during the trial and was interviewed by the State and the defense. The substance of the interview was not revealed to the court.

record is inadequate to support meaningful review of the claimed error.

## FLORIDA DNA SAMPLE

¶40 At trial, Mezquia moved to suppress the DNA test results from the cheek swab obtained in Florida. The trial court denied his motion, applying a balancing test and concluding that a cheek swab is a minimally intrusive search. The court further ruled that the evidence was lawfully obtained in Florida and there was no "inappropriate contact or assistance between Washington and Florida."[19]

¶41 Mezquia asserts that his rights under the Fourth Amendment and article I, section 7 of the Washington State Constitution were violated by the DNA sample obtained in Florida. His argument that Florida's DNA collection statute violates the Fourth Amendment has been rejected by Florida's appellate courts. See *Smalley v. State*, 889 So. 2d 100 (Fla. Ct. App. 2004); *L.S. v. State*, 805 So. 2d 1004 (Fla. Ct. App. 2001).[20] And the Washington Constitution does not govern the conduct of officials in other jurisdictions. *See State v. Bradley*, 105 Wn.2d 898, 719 P.2d 546 (1986); *State v. Gimarelli*, 105 Wn. App. 370, 20 P.3d 430 (2001).

¶42 Rather, the admissibility of the DNA sample obtained in another jurisdiction is governed by the silver platter doctrine under which evidence that is apparently lawfully and independently obtained in another jurisdiction is admissible in Washington, even if such evidence if obtained in Washington would violate Washington law. *State v. Brown*, 132 Wn.2d 529, 587-88, 940 P.2d 546 (1997); *State v. Gwinner*, 59 Wn. App. 119, 124-25, 796 P.2d 728

---

[19] Report of Proceedings (Mar. 3, 2004) at 291.

[20] We have also rejected a Fourth Amendment challenge to the Washington State DNA collection statute, which is essentially the same in purpose and substance as the Florida statute. *State v. Surge*, 122 Wn. App 448, 94 P3d. 345 (2004), *review granted*, 153 Wn.2d 1008 (2005).

(1990). Evidence is admissible under this doctrine when (1) the foreign jurisdiction lawfully obtained evidence and (2) the forum state's officers did not act as agents or cooperate or assist the foreign jurisdiction. *State v. Fowler*, 127 Wn. App. 676, 685, 111 P.3d 1264 (2005).

¶43 As the trial court correctly ruled, the biological sample was lawfully obtained in Florida.[21]

¶44 Mezquia argues that the silver platter doctrine does not allow the admission of the evidence because there was an inappropriate level of cooperation and assistance between Florida and Washington officials as participants in a national database. He asks this court to infer from Washington's participation in the database that "the government is actively seeking to circumvent the limitations of state law."[22]

¶45 In analyzing the issue of inappropriate assistance and cooperation, our courts have considered whether there was contact between Washington officials and the forum state's officers before the evidence was obtained. Courts have also considered whether there was evidence of antecedent planning, joint operations, or other cooperative investigation. *See State v. Johnson*, 75 Wn. App. 692, 700-01, 879 P.2d 984 (1994) (inappropriate level of cooperation existed where Washington officers accompanied Drug Enforcement Administration (DEA) agents to defendant's property, took aerial photographs at DEA's request, and turned photographs over to DEA).

¶46 Where the officials of the foreign jurisdiction gathered evidence independently and then contacted Washington police officers, our courts have concluded there is not an inappropriate level of cooperation. *See, i.e., Fowler*, 127 Wn. App. at 678 (Oregon police contacted Tacoma officers and informed them the defendants were in custody in Oregon); *Brown*, 132 Wn.2d at 588-90 (no agency or cooperation

---

[21] Although possession of burglary tools is a gross misdemeanor in Washington, it is a felony in Florida.

[22] Appellant's Br. at 59.

where Palm Springs police notified King County police that defendant had confessed to a killing in Seattle area and King County police asked Palm Springs police to interview defendant; King County police did not tell Palm Springs police what to ask or how to conduct interview); *Gwinner*, 59 Wn. App. at 121, 125-26 (no agency or other cooperation where Bellingham police officer relayed information to DEA that defendant would be trafficking cocaine through Seattle-Tacoma airport; no evidence that Bellingham officer requested subsequent vehicle search by DEA or knew search would occur).

¶47 Mezquia's claim of inappropriate cooperation between Washington and Florida because of their participation in the national database is not supported by authority. We conclude the DNA test results were admissible under the silver platter doctrine and the trial court properly denied Mezquia's motion to suppress the evidence

## EXCEPTIONAL SENTENCE

 ¶48 Mezquia argues that under *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the trial court's imposition of an exceptional sentence, without submission to a jury, violates his Sixth Amendment right to a jury trial. In *Blakely*, the Supreme Court held that " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " *Blakely*, 542 U.S. at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).

¶49 The jury did not determine whether the State proved the factual basis for Mezquia's exceptional sentence beyond a reasonable doubt. The sentence, therefore, violated his Sixth Amendment rights. *Blakely*, 542 U.S. at 305. Failure to submit aggravating factors to the jury is not susceptible to harmless error analysis. *State v. Hughes*, 154 Wn.2d 118, 148, 110 P.3d 192 (2005).

¶50 Mezquia's conviction is affirmed. His exceptional sentence is reversed and the case is remanded for resentencing.

COLEMAN and APPELWICK, JJ., concur.

Reconsideration denied October 5, 2005.