IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80729-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DARION ARKEI LIPSEY, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Darion A. Lipsey was found guilty of two counts of premeditated murder in the first degree, each with a firearm enhancement, following his second jury trial on the charges. The first trial had resulted in a hung jury. Lipsey's defense theory was one of general denial, focusing primarily on the credibility of the State's witnesses and the sufficiency of the State's evidence to meet its burden of proof. Lipsey claims numerous errors occurred at trial such that reversal is required. Finding no errors, we affirm Lipsey's convictions, but remand for resentencing in light of State v. Blake.[1]

## FACTS

Darion Lipsey was charged with two counts of premeditated murder in the first degree, each with a firearm enhancement, for the deaths of Isaiah Whitmore

---

[1] 197 Wn.2d 170, 481 P.3d 521 (2021).

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

and Hersey Purvis. Lipsey's first trial in February 2019 resulted in a hung jury. Lipsey was retried in August 2019 and he was convicted as charged.

In the early morning of March 30, 2016, Whitmore and Purvis were shot and killed in front of Chief Seattle Club in Pioneer Square. A Buick sedan, described as tan or gold and later found to belong to Jessica Malla, was captured on surveillance video in an alleyway near the location where the men were shot. The footage shows a man emerging from the vehicle before the shooting.

In addition to law enforcement, medical, and forensic personnel, the State presented a multitude of civilian witnesses at trial. However, only a few of them claimed to have been present on the morning of the shooting. Two men who had been near the alley asserted that they saw a man flee to the Buick, though they provided little description of him and did not identify Lipsey as the man they had seen. Another witness, Shonla Wooten, had been using drugs in front of the Chief Seattle Club when the shooting occurred. At trial, Wooten was extremely evasive and claimed that her recorded interview with police, which was shown to the jury for impeachment purposes, was inaccurate as she was intoxicated at the time and just repeating rumors she had heard. In the video, she identified the shooter as "Memphis," but acknowledged that she knew multiple "Memphises" who hung out in the area downtown. In that initial interview, detectives showed her numerous photos and she identified several of them as Lipsey.

Some of the key civilian witnesses included Glenda Carter, Tiffany Golden, and Jessica Malla, all of whom knew Lipsey personally or knew of him through his relationship to others. Golden was an acquaintance of Lipsey's who had not

testified at the first trial, but was brought in on a material witness warrant near the end of the second trial to testify in the State's case. Carter had testified in the first trial, but her presence was not secured for the retrial. After the court made a finding that Carter was unavailable for purposes of testifying, a redacted transcript of her testimony from the first trial was read into evidence at the second trial.

Malla was a critical witness for the State as she had been the driver of the Buick on the night in question. Malla was located by detectives after Carter implicated her in the crimes. Malla initially claimed she didn't know who was driving the vehicle and that she had nothing to do with the murders. After detectives advised her that they had information contradicting her denial of involvement, Malla implicated Lipsey as the shooter. She also admitted to being the driver that night, but claimed she believed Lipsey was merely going to conduct a drug deal. She explained that later the same evening Lipsey let her know what actually happened. Malla testified that she was dating Lipsey at that time and she knew him as "Memphis" and "D-Bo."

After closing arguments, where both the State and defense focused primarily on credibility of the witnesses in the case, the jury convicted Lipsey on both counts of premeditated murder in the first degree with a firearm enhancement on each count. The trial judge imposed a standard range sentence of 710 months, which included mandatory consecutive time for the enhancements. Lipsey now appeals.[2]

---

[2] Additional facts specific to each issue will be provided in the relevant section of the analysis.

ANALYSIS

I.      Rulings on Testimony

        A.  Witness Unavailability and Introduction of Prior Testimony

Lipsey first assigns error to the trial court's ruling that Carter was unavailable, which rendered her prior testimony admissible via transcript under ER 804(a)(5).  We disagree.

Prior to Lipsey's first trial, Carter was contacted by an officer from the Seattle Police Department (SPD) after she had gone to a shelter seeking protection.  She indicated that the Buick seen on the evening of the murders belonged to Malla.  Carter and Malla had been friends.  Carter stated that on one occasion, she heard a portion of a phone conversation that seemed to implicate Lipsey.  Carter said she overheard this conversation when she was with Malla while Malla had Lipsey on speakerphone.

Carter's testimony from the first trial also included a description of an occasion when she heard the couple discussing the fact that "Western Washington's Most Wanted" aired a video with the Buick in it and Lipsey purportedly claimed he was not worried about it.  Carter also said she ran into Lipsey at a store in September 2016 and let him know that she "wasn't fucking with him and neither was [Malla]."  She said Lipsey and his companions laughed at her and she told him "It's Hersey's world," which she explained advised Lipsey of her belief of his involvement in the shooting.  After she testified in the first trial, the State was unable to locate Carter for the retrial and moved to admit the transcript

- 4 -

of her prior testimony.  Defense counsel objected, arguing in part that the jury would be unable to properly assess Carter's credibility based on the transcript.

As to the assertion that the judge improperly found Carter was unavailable for trial, a decision to admit prior testimony under ER 804(b)(1) is reviewed for abuse of discretion.  State v. DeSantiago, 149 Wn.2d 402, 411, 68 P.3d 1065 (2003).  First, ER 804(a)(5) requires that the party seeking admission of a hearsay statement first establish the inability to procure the declarant's attendance "by process or other reasonable means."  Lipsey does not dispute that if Carter was unavailable, ER 804(b)(1) is satisfied because Carter's statements constitute former testimony.  "The question of unavailability is 'one of fact to be determined by the trial judge.'"  State v. Hacheney, 160 Wn.2d 503, 521–22, 158 P.3d 1152 (2007) (quoting State v. Allen, 94 Wn.2d 860, 866, 621 P.2d 143 (1980)).  Since the trial court is in the best position to evaluate unavailability, we do not easily overturn a trial court's factual unavailability ruling.  Id.

"A prosecutor offering an 'out-of-court statement of a witness beyond the legal reach of a subpoena' must show that he or she 'made an effort to secure the voluntary attendance of the witness[ ] at trial.'"  DeSantiago, 149 Wn.2d at 402 (quoting Rice v. Janovich, 109 Wn.2d 48, 57, 742 P.2d 1230 (1987)).  "Washington courts have held, as a general rule, that the prosecution must use all available means to compel the witness's presence at trial."  State v. Hobson, 61 Wn. App. 330, 336, 810 P.2d 70 (1991).  But, the degree to which the prosecution must go in producing a witness is a question of reasonableness.  Id.  "Whether the State has made a sufficient effort to satisfy the good faith requirement of ER 804 is a

determination that necessarily depends on the specific circumstances of the case and rests largely within the discretion of the trial court." State v. Aaron, 49 Wn. App. 735, 740, 745 P.2d 1316 (1987).

Lipsey argues the trial court erred in determining the State made a reasonable effort to secure Carter's presence. He points to the State's failure to seek a material witness warrant, however the record demonstrates that the State took other steps to locate Carter for trial. The court relied on those actions in reaching its conclusion as to her unavailability.

During the second trial, Lipsey was permitted to voir dire the SPD detective who had been tasked with securing Carter's presence for trial. The detective was successful in that regard for the first trial, though he testified that Carter was also difficult to track down then. During voir dire, the detective indicated that when he advised Carter of the mistrial, she clearly informed him that she would not be testifying again and he did not have contact with her again after that exchange. He testified that numerous unsuccessful calls had been made to three different contact numbers law enforcement had for Carter. Further, the detective entered her name into the jail booking reporting system multiple times and placed a "watch" in the system so that he would be notified if Carter was taken into custody anywhere in the country. He had also searched a multitude of databases for her.

Defense counsel produced records that appeared to indicate Carter was present in Snohomish County Superior Court on July 19, 2019, nearly a month before the second trial, to enter a guilty plea in a case she had there. Shortly before that, court records showed she had appeared to quash the felony warrant

in the case. Lipsey claimed that, had a material witness warrant been issued, either of these court appearances (plea or quash) would have resulted in her arrest and transfer to King County and the parties would have had sufficient contact with Carter to secure her appearance at the second trial. However, it is highly speculative to suggest that Carter would have been held on the material witness warrant for the month between her own court appearance in Snohomish County and the expected start of Lipsey's trial. The State pointed out to the trial court that two other witnesses, one of whom was Malla, had been served subpoenas for the first trial, but had not appeared in court as ordered. The State argued these witnesses did not appear precisely because of the amount of advance notice they had received and suggested that too much notice for a reluctant witness may actually make it less likely that they will appear.

The trial court ruled that "the State had made significant efforts to secure the attendance of Ms. Carter at the first trial." The court then acknowledged in its ruling that the State similarly made numerous attempts for the second trial, particularly with regard to the monitoring of various law enforcement databases. The judge then indicated, "I don't know that it is reasonable to expect detectives to go to court dates for witnesses for whom they're searching to wait to see if they show up and to serve them at that time." The court ultimately ruled the State had made reasonable efforts; however, since the State had been made aware of Carter's contact with Snohomish County Superior Court, the judge directed the prosecutor to follow up with counterparts there and seek assistance in contacting her.

Given the record before us, the judge's ruling on this issue does not constitute an abuse of discretion. Based on the efforts by the State, Carter's reluctance to testify at the first trial and later open acknowledgement of the same as to the second trial when contacted by the detective, the court was well within its discretion to conclude Carter was unavailable for purposes of ER 804(a)(5). The facts and overall context of the two trials indicate the court acted within its discretion, particularly given that unavailability is a factual determination which lies with the trial court. See Hacheney, 160 Wn.2d at 521–22. The trial court's ruling on Carter's unavailability was not error, so her prior testimony was properly admitted via transcript under ER 804(b)(1).

B. Instruction Regarding Testimony from Previous Trial

Lipsey next challenges the court's instruction just prior to the introduction of Carter's testimony via transcript. He asserts that the instruction was an impermissible judicial comment on the evidence. We disagree. The instruction provided here was modeled after the pattern instruction used for the admission of deposition testimony for a jury and it properly conveyed the law. This court "review[s] jury instructions de novo, within the context of the jury instructions as a whole." State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Article IV, section 16 of our state constitution prohibits a judge from instructing the jury that "matters of fact have been established as a matter of law" or conveying their personal attitudes toward the merits of the case. State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997). Such comments need not be expressly conveyed, but could be merely implied. Levy, 156 Wn.2d at 721.

Lipsey argues that the following instruction constituted an improper comment on the evidence by the judge:

> Ladies and gentlemen, you are about to hear testimony from a prior proceeding. The prior proceeding took place in this courtroom. Ms. Carter was under oath at the time of the prior proceeding and was subject to direct and cross-examination.
>
> You'll hear testimony actually from a transcript of that proceeding. I know that sounds a bit unusual to you, but that's the method that will be used with this testimony.
>
> [The deputy prosecutor] will be reading the questions on direct—that were asked on direct examination, [defense counsel] will be reading the questions asked on cross-examination, and . . . [another] deputy prosecuting attorney[] will read the answers that were provided by Ms. Carter.
>
> Any objections that you hear during the course of the testimony, if any, have already been ruled on by the court. You should evaluate this testimony in the same manner as you would any other testimony. And as with all other testimony, please pay close attention, as the testimony will not be repeated for you.

Here, Lipsey repeats the argument he made in the trial court; the instruction circumvented the jury's ability to assess Carter's credibility. Lipsey appears to be most concerned with the impact of Carter's absence on the jury's ability to weigh the credibility of her testimony. The trial court made an effort to address this concern by shifting the phrase "giving weight" to "evaluate," noting "That way the jury's instructed they'll evaluate using all the other jury instructions and you can evaluate credibility that way." This instruction was not error. As the State points out, "The manner by which the jury was to consider the testimony was later outlined for them in the written jury instructions."

Though Lipsey avers the instruction undercuts the jury's ability to consider Carter's absence as it relates to her credibility, he fails to cite any authority for this assertion. Further, he fails to demonstrate how this approach to handling Carter's

testimony prevented him from exploiting her absence in closing argument to the jury. At the beginning and conclusion of trial, the jury was directed to listen carefully to all the witnesses and was properly instructed as to their role as the sole judges of credibility. The specific instruction given prior to the introduction of Carter's transcript testimony explained a unique procedural aspect of that portion of the trial and did not constitute a judicial comment on the evidence.

C. Descriptive Testimony and Admissibility under ER 404(b)

When the trial court admitted Carter's testimony via transcript, it included a statement where she described Lipsey as having a "hard face." The judge also allowed the State to introduce Lipsey's jail booking photo pursuant to its attempt to rehabilitate Carter's credibility regarding her identification of Lipsey, which the defense put at issue during cross-examination. Lipsey assigns error to the trial court's ruling to allow Carter's testimony that Lipsey had a "hard face" on the basis that it constituted improper propensity evidence. This is incorrect, none of the evidence Lipsey now challenges in this assignment of error constitutes so-called "prior bad act" evidence under ER 404(b) and was not offered for propensity.

We review a trial court's interpretation of ER 404(b) de novo, but if we find that the rule was interpreted properly, we then review the decision to admit or exclude ER 404(b) evidence for abuse of discretion. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). ER 404(b) prohibits admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." "This prohibition encompasses not only prior bad acts and unpopular behavior but any evidence offered to 'show the character

of a person to prove the person acted in conformity' with that character at the time of a crime." State v. Foxhaven, 161 Wn.2d 168, 175, 163 P.3d 1786 (2007) (emphasis in original). Such evidence may, however, be admissible for another purpose such as proof of motive, plan, or identity. Id.

In order to admit ER 404(b) evidence, the trial court "must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). Such analysis must occur on the record and if the evidence is admitted, a limiting instruction must be given. Foxhaven, 161 Wn.2d at 175.

The first step in our review is to determine whether the testimony Lipsey challenges even falls within the scope of ER 404(b). Carter's testimony describing Lipsey as Black and having "a real hard face" occurred during re-direct, after defense put Carter's familiarity with Lipsey at issue during cross-examination as a means of challenging her ability to identify him. The State was seeking to rehabilitate Carter as the comment actually came from a description Carter had given in an earlier police interview. Her full statement on this topic from the interview had been partially redacted as it did contain improper comments from Carter about Lipsey's character. The booking photo, which the defense now argues was also improperly admitted, was utilized to establish that the description Carter gave of Lipsey during that police interview conformed with his appearance

closer in time to when she made the comment, as opposed to how he appeared at defense table during trial.[3]

Carter's brief physical description of Lipsey and his booking photo did not constitute ER 404(b) evidence, but rather fell more in line with the trial court's description:

> When I look at the transcript as a whole, I see cross-examination with regard to identification and accuracy of identification from Glenda Carter, rehabilitation is she described this person—it's not the State's words, it's the witness's words, that she had previously described this person as a [B]lack male with a hard face. Does that match—this photo of the person that you're describing as the [B]lack male with the hard face, is the testimony, as I read it. . . .
> And so I think, you know when I look at it sort of in the light of just this transcript, I don't see that there's any suggestion. Hard face can be a way that somebody describe a person, right? Or a soft face, or a kind face or a mean face or—I mean, there are a bunch of different ways they could do it. I think context is very important.

The court did not err in admitting Carter's testimony about Lipsey having a "hard face" and his booking photo for comparison.

D. State's Elicitation of Fear of Testifying

Lipsey next argues it was improper for the prosecutor to have examined Golden regarding her fear of testifying at trial and that such questioning constituted improper bolstering of the witness. However, the inquiry was appropriate given the State expected the defense would put Golden's credibility at issue, which defense counsel did, in fact, do on cross-examination.

Golden had not testified at the first trial and was brought in on a material witness warrant near the end of the second trial. She was an acquaintance of

---

[3] The booking photo did not show Lipsey in jail attire.

Lipsey who testified that they ran into one another at King County Superior Court when they each appeared for their respective hearings on the same docket. Golden asserted that during that encounter, but after they had left the courthouse, Lipsey admitted to her that he killed Whitmore and Purvis.

We review the trial court's admission of evidence for abuse of discretion. State v. Sexsmith, 138 Wn. App. 497, 504, 157 P.3d 901 (2007). Lipsey points to the following testimony as prejudicial error:

> [STATE]: Ms. Golden, are you afraid to be here this morning?
>
> A: Yeah
>
> Q: May I ask why?
>
> [DEFENSE]: Object, relevance.
>
> THE COURT: She can answer the question.
>
> A: I know a lot of people and a lot of people know me, and (unintelligible).

Lipsey asserts that State v. Bourgeois, 133 Wn.2d 389, 945 P.2d 1120 (1997), stands for the rule that no evidence of a witness's fear of testifying may be elicited without evidence that the accused personally instilled such fear in the witness. This is a misrepresentation of the holding in Bourgeois, which actually makes clear that it was proper for the State to have sought testimony regarding Golden's fear of testifying since her credibility was put at issue by the defense during cross-examination. Id. at 400–02.

In Bourgeois, the Supreme Court held that eliciting testimony about a witness's fear or reluctance to testify is proper and relevant if the witness's credibility will be called into question. Id. The Bourgeois Court stated that "it was

reasonable for the State to anticipate the attack and 'pull the sting' of the defense's cross-examination." Id. at 402. The Supreme Court found error where the trial court allowed three witnesses to testify about their fear of doing so when their credibility had not been challenged and was unlikely to be. However, a fourth witness's testimony about being fearful was proper since the defense had attacked his credibility during cross-examination. Id. at 400–02.

Here, Lipsey's defense theory focused almost entirely on credibility and his attorneys consistently and aggressively challenged the State's witnesses on cross-examination. This strategy was in full play while cross-examining Golden; she was questioned regarding her relationship with one of the victims and her fear of the victims' gang affiliations. She was examined about inconsistent prior statements and her credibility generally, including an inquiry as to why Lipsey would confess to her about having been the shooter. This brief testimony regarding Golden's fear does not constitute an abuse of discretion, particularly in light of the broader defense attack of Golden's credibility on numerous grounds.[4]

II.     The Right to Present a Defense and Exclusion of Evidence

Lipsey also asserts that his constitutional right to present a defense was violated when the trial court excluded evidence that Whitmore was armed with a gun at the time of this death and that there was a particular group of other people who may have wanted Whitmore dead.

---

[4] We accept Lipsey's withdrawal of a similar claim regarding a purported comment by the State as to another witness's truthfulness.

Courts must safeguard the right to present a defense with meticulous care. State v. Maupin, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). However, the evidence for which admission is sought under the federal constitution's Sixth Amendment right to present a defense must be relevant and admissible. State v. Mezquia, 129 Wn. App. 118, 124, 118 P.3d 378 (2005). The standard of review for consideration of an asserted violation of the right to present a defense has recently been refined by our Supreme Court. See State v. Arndt, 194 Wn.2d 784, 453 P.3d 696 (2019); State v. Jennings, 199 Wn.2d 53, 502 P.3d 1255 (2022). Arndt set out the test as beginning with an abuse of discretion review as to the underlying evidentiary rulings and, if the reviewing court determined there was no abuse of discretion, concluding with de novo review of whether the evidentiary ruling violated the accused person's constitutional right to present a defense. 194 Wn.2d at 797–814. A few years later in Jennings, the Court clarified that Arndt does not require analysis of both parts of the test in every case nor that the steps must be considered in a particular order; the unique facts before the reviewing court necessarily drive the application of the test. Jennings, 199 Wn.2d at 59.

In his reply brief, Lipsey specifically identifies the three topics he wished to explore at trial that went to his defense: he sought to "question the State's witnesses about their knowledge of other gang-involved people who wanted Mr. Whitmore dead, the fact Mr. Whitmore was armed, and that detectives were provided with the name of another suspect."[5] Under Mezquia, "[i]n order to be

---

[5] Lipsey's claim that he sought to establish Purvis was also armed at the time of the shooting was raised for the first time on appeal in his reply brief. We will not reach new issues presented in a reply brief. RAP 10.3(c).

relevant, and therefore admissible, the evidence connecting another person with the crime charged must create a trail of facts or circumstances that clearly point to someone other than the defendant as the guilty party." 129 Wn. App. at 124. It is noteworthy for purposes of our review that neither Arndt nor Jennings involved a defense relying on other suspect evidence, which is defined and controlled by its own specific body of case law and necessarily directs the admissibility phase of our review. See State v. DeJesus, 7 Wn. App. 2d 849, 866–72, 436 P.3d 834 (2019); State v. Franklin, 180 Wn.2d 371, 325 P.3d 159 (2014); State v. Wade, 186 Wn. App. 749, 763–68, 346 P.3d 838 (2015). Accordingly, we are then tasked with weaving the specific test for admissibility of other suspect evidence into the broader framework of the right to present a defense. We therefore first look to whether Lipsey has carried his burden in establishing proper other suspect evidence, such that we can review the trial court's evidentiary rulings. See DeJesus, 7 Wn. App. 2d at 865–66.

The arguments as to this other suspect evidence, or a desire to focus on other groups of gang-involved individuals who may have wanted Whitmore dead, are variously muddled and contextualized in both the argument at the trial court and in briefing on appeal. The discussion identified in the record went to a motion presented at the first trial. The initial ruling on that motion was later incorporated into the second trial without additional argument:

> THE COURT: Number six is a motion to exclude evidence of other suspects. Does the defense intend to proffer other suspect evidence?
>
> [DEFENSE]: So, your Honor, we are not planning to provide a name or a specific suspect in this case, other suspect. However, Mr.

> Lipsey's defense is that he was not the one in the car with Jessica Malla, and there was some other suspect unknown to all of us that was in the car. We do plan to develop that. We do plan to ask questions about that, and that is our defense theory at trial. That's the defense. So I just want to clarify for the Court that while we are not presenting what the law characterizes as other suspect evidence, that's the defense.
>
> THE COURT: All right. In essence, general denial?
>
> [DEFENSE]: It's a general denial, yes.
>
> THE COURT: All right. And [does the State have] anything further with regard to that motion?
>
> [STATE]: No, your Honor. Thank you.
>
> THE COURT: All right. So that motion with regard to other suspects is granted.

Later in the first trial, during further argument on motions in limine, the defense expressed its intention to introduce evidence of rumors from the streets that Whitmore was responsible for two other murders, noting a particular focus on one over the other.[6]  Both parties agreed to submit additional briefing on the issue.

When the matter was taken up again after supplemental briefing, the court issued the following ruling:

> The defense argues that this evidence is not being offered as other suspect evidence, but instead should be admissible as res gestae. In other words, that although otherwise inadmissible this evidence is so connected in time, place and circumstances that it's necessary for a complete description of the crime charged.
>
> The defense in this case is that Mr. Lipsey was not present, and had nothing to do with the death of Mr. Whitmore or Mr. Purvis. By implication of course that somebody else would have killed them. The argument is that to present that defense the defense must show that someone else had the motive to kill them. I'm not convinced that this is res gestae evidence. It's not offered nor is it necessary to complete the description of the crime charged. Instead the evidence is being offered to suggest that there may be others out there that wanted to harm Mr. Whitmore. That had a motive to do so. Suggesting not just that something else killed him, but that there was a specific group of people that had the motive to kill him. Those that

---

[6] There is little discussion in the record as to precisely what evidence existed as to the second unrelated murder.

- 17 -

might want to retaliate for the murders that they believed he was responsible for, that specific group of people.

This is, in fact, other suspect evidence rather than an individual other suspect arguments there is a community of people that would have had the motive to carry out the murder in this case. Specifically directing the jurors to a specific group of people that had that motive. It is true that Mr. Lipsey has a constitutional right to present witnesses and to present a defense, but that does not extend to irrelevant or inadmissible evidence.

Clearly inadmissible evidence—clearly these rumors would be inadmissible evidence unless they meet the definition of some exception like other suspect or some other specific exception. When considering evidence that some other suspect or people committed or may have committed a crime the Court must consider whether some combination of facts or circumstances point to a nonspeculative link between other suspect or suspects and the charged crime.

This ruling was later incorporated into the second trial when the motion to exclude was renewed.

"'The standard for relevance of other suspect evidence is whether there is evidence "tending to connect" someone other than the defendant with the crime.'" DeJesus, 7 Wn. App. 2d at 866 (quoting Franklin, 180 Wn.2d at 381). Essentially, this requires that "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Franklin, 180 Wn.2d at 381. "This inquiry, properly conducted, focuses on whether the evidence offered tends to create a reasonable doubt as to the defendant's guilt, not whether it establishes the guilt of the third party beyond a reasonable doubt." DeJesus, 7 Wn. App. 2d at 866. The defendant bears the burden to establish other suspect evidence is admissible. State v. Strizheus, 163 Wn. App. 820, 830, 262 P.3d 100 (2011).

Here, the evidence that Lipsey sought to admit, though minimally relevant as other suspect evidence, is far too speculative to meet the threshold for admission. Lipsey is unsuccessful as to his burden of demonstrating how such testimony could have been properly elicited if it had been deemed admissible as other suspect evidence. Specifically, he fails to address how the testimony could overcome other evidentiary obstacles since it is classic hearsay. See ER 801. The record establishes that Carter, Malla, and one of the SPD detectives each possessed information about a general belief among certain communities that Whitmore may have committed an unrelated murder, which put him at risk of retaliation. However, Lipsey provides no argument as to how testimony of this nature would have satisfied a hearsay exception, which suggests a separate hurdle to admissibility. Lipsey does not engage in such analysis, offering no potentially applicable hearsay exceptions to this court.

Our opinion in State v. Rafay is most informative to the case at hand. 168 Wn. App. 734, 285 P.3d 83 (2012). In Rafay, the defendant sought to admit "other suspect evidence" based on information from two sources that there were two separate violent Muslim groups who may have committed a murder; one of the sources provided more than a dozen names of possible suspects. Id. at 800. This court rejected the assertion that a sufficient nexus had been established between the two separate tips and the crime. In particular, there was no "information that placed someone near the murder scene, indicated that someone had acted on the possible motive, or that linked any other individual or group member to the murder." Id. at 800–01.

The same is true here. A proper foundation for admission of other suspect evidence "requires a clear nexus between the other person and the crime." Id. at 801. "The proposed testimony must show a 'step taken by the third party that indicates an intention to act' on the motive or opportunity." Id. (quoting State v. Rehak, 67 Wn. App. 157, 163, 834 P.2d 651 (1992)). Here, Lipsey has failed to establish any clear nexus sufficient to support his claim that the trial court erred in excluding evidence that Whitmore was suspected of committing an unrelated murder and may have been targeted by others as a result.

The defense is confronted by similar obstacles regarding admission of a vague informant tip the defense also sought to introduce. Lipsey claims that he should have been able to present evidence which he asserts implicated another individual as having committed the murders—but fails to identify the contents or veracity of the tip. The record reveals this is likely a matter discussed months before the first trial about an informant who received a text stating only the word "Greenlight," which the informant then disclosed to a detective. Assuming this is the information to which Lipsey is referring, he does not meet the required specificity for admissibility as to other suspect evidence. See Rehak, 67 Wn. App. at 162–63.

Though Lipsey also argues he was not allowed to present evidence that the decedents were armed at the time of the shootings, such evidence was admitted as to Whitmore. In fact, defense reminded the jury of that testimony during closing argument, stating, "According to [Malla], Mr. Whitmore points a gun at her while she's driving southbound on 2nd Avenue, past the Chief Seattle Club, for no

apparent reason." Lipsey focuses on the ruling before the first trial that excluded evidence of whether Purvis and Whitmore were armed at the time of their deaths, which was incorporated into the second trial. Lipsey's argument to the trial court, in light of the fact that he was not raising a claim of self-defense, was:

> So the fact that these two were armed, we are not going to be suggesting that they pulled the gun out. That this was self-defense. But the fact that they are armed and hanging out in Pioneer Square at 6:00 in the morning, and these two may have been wanted by others, and may have been targeted by others is absolutely a part of the defense in terms of someone else could have done this, other than Mr. Lipsey.

This contention is once again aimed at other suspect evidence. For the same reasons set out above, Lipsey has not established a sufficient nexus between another person, or vague group of persons, and the charged crimes such that we could conclude the court abused its discretion in excluding this evidence.

Though the right to present a defense is raised on appeal, Lipsey fails to carry his burden to demonstrate how he could have established other suspect evidence such that it could be properly admitted. This is a critical first step in our consideration of a claim that the right to present a defense was violated because the defendant must prove that the excluded evidence was admissible. "The fundamental due process right to present a defense is the right to offer testimony and compel the attendance of a witness." State v. Lizarraga, 191 Wn. App. 530, 552, 364 P.3d 810 (2015). But again, "the right to present a defense does not extend to irrelevant or inadmissible evidence." Strizheus, 163 Wn. App. at 830 (citing State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010)). Lipsey has not provided sufficient information to establish more than a tangential link between the

evidence he sought to admit and the murders of Whitmore and Purvis. Accordingly, the trial court did not err in excluding the evidence.

Having concluded that the trial court's evidentiary rulings were proper, we next consider the right to present a defense de novo, pursuant to Jennings. Because Lipsey fails to demonstrate why this other suspect evidence was admissible, he also fails to establish that a violation of his right to present a defense based on the court's ruling excluding that evidence. An individual "has no constitutional right to have irrelevant evidence admitted in [their] defense" State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). Lipsey has not clearly identified for this court what specific evidence was sought, much less that it met the applicable legal standards such that it was relevant. Without more, the denial of the nebulous evidentiary exploration Lipsey sought at trial as to the speculation that an individual or group of individuals in the area may have wanted Whitmore dead did not deny Lipsey his constitutional right to present a defense. See State v. Downs, 168 Wash. 664, 13 P.2d 1 (1932) (demonstrating that Washington has long required more than mere speculation for admitting evidence to support an other suspect defense).

III.    Sufficiency of the Evidence as to Premeditation

Lipsey argues that, due to the language of the to-convict instruction provided to the jury, the evidence presented at trial was insufficient as to the element of premeditation for the murder of Purvis contained in count II and, as a result, his conviction on that count must be reversed. Lipsey's assertion is not that the to-convict instruction for the premeditated murder of Purvis was legally

insufficient, but instead that insufficient evidence was presented to find Lipsey's intent as to Purvis was premeditated. The to-convict instruction for count II read as follows:

> To convict the defendant of the crime of murder in the first degree as charged in count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about March 30, 2016, <u>the defendant acted with intent to cause the death of Hersey Purvis</u>;
> (2) <u>That the intent to cause the death was premeditated</u>;
> (3) That Hersey Purvis died as a result of the defendant's acts; and
> (4) That any of these acts occurred in the State of Washington.
>     If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>     On the other hand, if after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

(Emphasis added.) At trial, the court also provided the following pattern instruction defining transferred intent: "If a person acts with intent to kill another, but the act harms a third person, the actor is also deemed to have acted with intent to kill the third person." Lipsey did not object to either of these instructions, however a challenge regarding the to-convict instruction may be raised for the first time on appeal. <u>State v. Sloan</u>, 149 Wn. App. 736, 742, 205 P.3d 172 (2009).

Lipsey avers that the to-convict instruction provided to the jury for the shooting of Purvis, which the State proposed, became the law of the case. He further argues that if the State relied on premeditation as to Whitmore's shooting to satisfy the second element contained in the to-convict instruction for the allegation as to Purvis, the instruction as written established transferred intent as an additional element for the State to prove. While we agree with his proposition

that the instruction became the law of the case, we do not adopt his position as to the claim of an additional element. At oral argument before this court, Lipsey opined that transferred intent was required to have been set out within the instruction, however he provided no authority for this proposition or model language to demonstrate how this should be done.

Though Lipsey has framed his assignment of error as a claim of insufficient evidence, the true inquiry before this court is whether the to-convict instruction must capture transferred intent as to premeditation. When we consider a claim of error as to the to-convict instruction, we generally cabin our inquiry to that instruction to determine whether it is legally sufficient. However, even in the context of a challenge to a to-convict instruction, we may look to the accompanying definitional instructions given by the court. State v. Tyler, 191 Wn.2d 205, 217–18, 422 P.3d 436 (2018) ("Reading the to-convict instruction in context with the related definitional instruction is thus consistent with our long-standing general rule."). The to-convict instruction provided here contained all elements of premeditated murder and was modeled after WPIC 26.02.[7] It need not have expressly captured the concept of transferred intent since that is not an essential element of the charged crime. See State v. Tyler, 191 Wn.2d at 217–18.

It is clear in light of the conviction on both counts of premeditated murder that the jury utilized the doctrine of transferred intent to find Lipsey guilty as to the murder of Purvis. In finding Lipsey guilty of the premeditated murder of Whitmore, we can deduce that the jury found the evidence satisfied the essential elements of

---

[7] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.02 (4th ed. 2016).

count I, which included premeditation. The jury was instructed on the lesser included offense of murder in the second degree, which does not require proof of premeditation, and had the option to convict Lipsey of that crime based on the evidence or lack thereof. Because, when considering Whitmore's death, the jury declined to either acquit Lipsey of premeditated murder or convict him on the lesser included charge of murder in the second degree, we can conclude that the jury found premeditation was proved beyond a reasonable doubt in that count. The jury then used the separate definitional instruction on transferred intent to also convict Lipsey of the premeditated murder of Purvis. The record supports the conclusion that the jury relied on the evidence as presented, and the law of the case as provided by the court through its instructions, including definitional instructions, to render its verdict.

Lipsey does not challenge sufficiency as to count I involving Whitmore, which suggests he concedes premeditated intent was established as to that crime. Accordingly, we are left to consider only whether the instructions as given properly advised the jury that such intent may be transferred as to the death of Purvis. At oral argument, the State noted that the pattern instructions allow for the concept of transferred intent to be captured within the to-convict instruction for premeditated murder, but that there is no authority for the claim that a jury may not be instructed as it was here: with a separate definitional instruction on transferred intent. Lipsey does not dispute that premeditated intent may be transferred generally, but instead focuses on the manner by which this concept was set out in the instructions. The State presented sufficient evidence at trial to support the

conviction in count II for the death of Purvis and the record demonstrates that the jury was properly instructed on the law.

IV.     Prosecutorial Misconduct

Lipsey next identifies numerous arguments by the prosecution during closing, which he asserts constituted misconduct.  In a prosecutorial misconduct claim, the burden is on the defendant to establish that the challenged conduct was improper and prejudicial in the context of the entire record.  State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).  To demonstrate prejudice, Lipsey must establish that there exists a substantial likelihood that the misconduct affected the jury's verdict.  State v. Thorgerson, 172 Wn.2d 438, 442–43, 258 P.3d 43 (2011).  "Defense counsel's failure to object to the misconduct at trial constitutes waiver on appeal unless the misconduct is 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' incurable by a jury instruction."  State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (internal quotation marks omitted) (quoting State v. Gregory, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006)).  "References to . . . bald appeals to passion and prejudice constitute misconduct."  Fisher, 165 Wn.2d at 747.  "Allegedly improper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument and the instructions given."  State v. Russell, 125 Wn.2d 24, 85–86, 882 P.2d 747 (1994).

A. Use of Impeachment Evidence as Substantive

Of all the incidents Lipsey identifies as prosecutorial misconduct, there is only one to which he objected at trial. He argues that the State improperly asserted that the jury could utilize the interview with Wooten, recorded within two days of the shooting, as substantive evidence when it was only admitted to impeach her. The video shows Wooten identifying Lipsey in photographs, though she did so as "Memphis" since she did not know his legal name. Prior to her testimony before the jury, the parties conducted voir dire of Wooten regarding her recollection of the events on the date of the murders. Earlier in the proceedings, the State had moved to admit the entirety of the video as a recorded recollection under ER 803(a)(5), but after voir dire and comparison of Wooten's testimony at the first trial with her anticipated testimony in the second, the judge denied the motion. The court's reasoning was that Wooten did not appear to lack sufficient memory of the shooting such that ER 803(a)(5) would be a proper basis for admitting the video.

Wooten was evasive when she took the stand, which led the trial court to deem her a hostile witness.[8] The video was utilized to impeach her denial during testimony that she saw "Memphis" on the morning of the shooting. This establishes an odd posture because Wooten's substantive statement at trial was that she did not see "Memphis." As such, if the jury utilized her prior statement to find her not credible as to that denial during her trial testimony, the inverse proposition after impeachment was that Wooten had seen "Memphis" at the scene of the shooting. Further, during her testimony at the second trial Wooten also

---

[8] Defense did not dispute this determination.

commented "He actually looks better now," which seems to support the inference that Lipsey is in fact the "Memphis" Wooten had just denied seeing the night of the shooting. However, the next thing Wooten said was "It's not the same man, because I didn't see him shoot anyone."

In its preliminary closing argument, the State directly acknowledged that there were limitations on how the evidence of Wooten's statements in the video could be used:

> Before I talk to you a little bit about Shonla Wooten's testimony, I want to talk to you about one of the instructions that [the judge] just gave you, and it's jury instruction number six, and it tells you that certain evidence with respect to Shonla Wooten was admitted for a limited purpose, that some of the evidence that appeared on the videotape has only a limited purpose.
> To the extent that Shonla Wooten's prior recorded statements on the videotape are inconsistent with her trial testimony here in court, you may only consider those video statements only for the purpose of evaluating her credibility, whether she's being honest with you and forthright or not. You may not consider it for any other purpose.

After this, the prosecutor walked through the statements based on this odd posture and explained how impeachment would operate if the jury were to find that Wooten had, in fact, been successfully impeached. Later in rebuttal closing, the prosecutor responded to the assertion in defense's closing argument that Wooten is not a reliable witness. The prosecutor again discussed what had been said in the video and Wooten's testimony on the stand. This is the only time defense counsel objected to any of the issues Lipsey now claims were misconduct. The trial court then provided instruction to the jury that they were to determine the facts and to refer to the instructions.

As a preliminary matter, this was not misconduct as the prosecutor was very specific in closing when explaining how Wooten's various statements operated within this unusual posture. Further, even if Lipsey were to succeed in establishing misconduct, he would be unable to demonstrate prejudice. While there was no objection the first time the State addressed this topic, the court properly instructed the jury when defense objected during the State's rebuttal closing. We presume that a jury follows the court's instructions. State v. Weaver, 198 Wn.2d 459, 469, 496 P.3d 1183 (2021). Additionally, when we consider Wooten's statements in the context of the entirety of the record, especially given that Malla and Carter both expressly identified Lipsey as the shooter, it is not likely that Wooten's statements affected the jury's verdict. While this is admittedly an unusual posture, given how impeachment played out in this instance, the argument by the prosecutor regarding Wooten's statements was not misconduct.

B. Vouching Based on Personal Participation and Opinion on Truthfulness

Lipsey next asserts that the prosecutor vouched for Malla who, according to the defense theory, pinned the murder on her ex-boyfriend (Lipsey) after she was implicated in the crime. Importantly, this argument was presented despite testimony that Malla did not receive immunity from the State, based only on the defense proposition that there was a silent implication from the prosecutor to cut Malla a deal if she testified against Lipsey.

A prosecutor cannot vouch for a witness. "Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness."

Thorgerson, 172 Wn.2d at 443. This is because credibility determinations are entirely within the province of the trier of fact. Id. However, the argument here does not constitute vouching as the prosecutor was simply responding to the strategy of defense counsel.

Some of the comments Lipsey complains of are as follows: in opening, the prosecutor described Malla talking to detectives, "Jessica Malla began to cry. But, more importantly, she began to tell the detectives the truth." Then in closing, the prosecutor stated,

> You know, if I wanted her to testify and I thought she was—I could give her immunity and force her to testify, Jessica Malla told you she didn't need it because she didn't do anything wrong. . .
> But we know [Golden]'s not a liar, because the State stood up, I stood up, and showed you the certified copies of the documents that established whenever it was, we know it was April 4th, it was not a month later, it was, in fact, close to the murders themselves. . .
> Remember when I asked—I think I asked, "Where'd you park your car?" and she said something, "Under the bridge," and I said something like, "You mean under 4th Avenue, where Yesler goes across," I thought is what she meant by the bridge. . .
> If you remember, you watched her testify and she was—I think she maybe even had her eyes closed, she had that video in her head of what actually happened, and she, like people who tell the truth, have the video in their head that she could go to. So why make that up? Why make up that fact?

The use of "I" and insertion of first person statements by the prosecutor might well be improper vouching in most cases, however Lipsey employed a strategy, which rendered such comments proper in response to the assertions in defense closing. In light of the overall trial record, and specifically the arguments of defense counsel, the comments by the prosecutor do not constitute improper vouching or misconduct.

C. Comments on Defense Trial Tactics

Lipsey next claims the prosecutor engaged in misconduct by improperly denigrating defense counsel at two points in the State's rebuttal closing. "It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." Thorgerson, 172 Wn.2d at 451. To the extent a prosecutor's comments "can fairly be said to focus on the evidence before the jury," misconduct did not occur. Id.

The first comment Lipsey challenges is, "That's pretty sweet, isn't it, a defense attorney complaining that somebody would have access to an attorney? That's different, I must say." The prosecutor directed this statement at defense counsel's argument in closing that Malla's motives behind her testimony were questionable at best and that a "wink wink" deal had been reached with the State despite her testimony that she did not receive an offer of immunity from the prosecutor. Defense counsel specifically noted that Malla had an attorney and criminal penalties had not been discussed, and then argued "That would only happen if [the State] gave her strong assurances." Though the responsive argument by the State was inartful, it was a direct answer to an assertion by the defense attorney and the State's broader theory presented in closing that did go to facts in evidence. Further, the issue was not explored beyond the isolated comment by the prosecutor. Even if this constituted error, it was easily curable via instruction had defense objected. As such, Lipsey has not met his burden to demonstrate that the statement was so ill intentioned and flagrant that instruction could not cure it. See Fisher, 165 Wn.2d at 747.

The other comments Lipsey argues were improper are that the prosecutor did not "blame" defense counsel for their strategy and that he would have similarly argued that reasonable doubt is "unattainable." These statements were in tandem with the prosecutor saying he did not "blame" the defense for arguing that the jury should discount Malla, Wooten, and Golden and asserting "everybody that the defense doesn't like is a 'fraudster.'" These "blame" arguments do not constitute disparagement of defense counsel; they were again in direct response to defense closing where the focus was reasonable doubt based on the credibility issues of key witnesses. This is classic rebuttal and was not improper such that a curative instruction would be necessary. This was a trial where credibility was at the center of almost every argument and the crux of the defense. The prosecutor's argument appears to be responsive to the defense theory of the case and sufficiently rooted in evidence such that it was not improper in the context of the trial as a whole.

D. Improper Vouching Relating to Attitude and Conduct "of the streets"

Lipsey next asserts the prosecutor improperly argued "the streets don't talk" and vouched for numerous witnesses by signaling to the jury that since certain witnesses were willing to talk, despite this purported code, they must be more truthful.

This argument is unpersuasive in a trial where not only was credibility central to the dueling case theories, but where all civilian witnesses, both decedents, and the accused were involved in a particular lifestyle such that it permeated the entire case. There was no vouching when all of these themes were broadly explored by both parties throughout the testimony. Further, there is no

question that credibility was the key to the case and the focus for the defense attacks on the State's trial presentation, particularly in the absence of a self-defense claim.

Whether purportedly rooted in delayed reporting, fear of prosecution, fear of the defendant, not wanting to be a snitch, or not wanting to be in court, inconsistent statements and impeachment were addressed throughout this trial by both sides. In the context of the record as a whole, the comments by the prosecutor regarding skepticism of police, the courts, and lifestyle of the "streets" were not improper argument and, further, sufficient evidence was adduced regarding such topics that much of it took on a general theme. Finally, the defense attorneys also utilized the theme of witnesses being "of the streets," albeit with slightly different wording, to attack their credibility, which undercuts the argument this phrasing constituted a coded form of vouching.[9]

E. "Us vs. Them" and Racial Bias

Lipsey frames the prosecution's discussion of the various people involved this case as one focused on race, however this mischaracterizes the argument presented at trial. Specifically, Lipsey points to the language of "them," "these people[,]" and "not like us" as coded racialized language, focusing on the prosecutor's argument surrounding the world of the "streets." However, considering the challenged statements in context, we do not find the word choice of the prosecutor here constitutes impermissible racialized coding, such as the

---

[9] Lipsey also suggests in briefing that argument regarding "the streets" went to facts not adduced at trial, however numerous witnesses described their experiences of "the streets" during their testimony. This description and overall sentiment was pervasive throughout the trial.

infamous language used by the prosecution in State v. Monday. 171 Wn.2d 667, 257 P.3d 551 (2011).

Here, the witnesses themselves often discussed "the streets" in ways that established their perspective that this particular life experience was unique. The State sought to address that this was a case about credibility in a community that may have been unfamiliar to some members of the jury. Viewing the closing arguments as a whole demonstrates that the prosecution was reacting to the theory Lipsey utilized that centered issues of credibility. Much of the State's closing sought to humanize the victims and rehabilitate the witnesses as credible despite those attacks by the defense. These statements, when considered in the whole of State's closing argument and the case at-large, do not to constitute misconduct.

F. Value of Victims' Lives as Evoking Passion of the Jury

Lipsey's final ground for his claim of prosecutorial misconduct is that the State impermissibly sought to inflame the passion of the jury by urging to convict for reasons other than the evidence presented. The portion of closing argument at issue is as follows:

> As I said to you at the beginning, there's a temptation to say perhaps that Isaiah Whitmore and Hersey Purvis brought this upon themselves, they chose their life style, they chose to hang out in front of the Chief Seattle Club. Should we even mourn their deaths? Should we? Should we care? I'm suggesting to you that we must, must care. But to put it another way, does the defendant get a break? Does Hersey Purvis and Isaiah Whitmore, who were not the most sympathetic victims in a criminal murder case?
> …
> Do not discount—I ask you, do not discount what the defendant did, don't discount Isaiah Whitmore and Hersey Purvis' lives. They may

> have been of the street, they may have been drug users, there may have been some gang association or affiliation, but when March 30th, 2016, began, Isaiah Whitmore and Hersey Purvis were alive. And with life, I would suggest to you, comes hope for the future. There's probably very little chance that Isaiah Whitmore would ever win a Nobel prize, that Hersey Purvis would cure cancer, but we do not know that, we don't.

Lipsey avers that these comments "invited the jury to contrast the human value of a person who is 'of the streets' with a life the prosecutor appears to believe has more inherent value, such as a scientist who cures cancer [] and because Mr. Lipsey too is labeled a person who is 'of the streets,' these statements posit the inverse notion that Mr. Lipsey's life could mean less than another person's."

In the context of a trial where the majority of the individuals were involved in a lifestyle which may have been markedly distinct from that of some members of the jury, to argue that the jury should value the victims' lives and hold the accused accountable for their deaths is not improper. Further, it directly addressed the exact narrative of the defense: that no one could be trusted and this was pinned on Lipsey because he was of the streets and the other witnesses were pressured to give up an easy name that the police would quickly focus on as a suspect. While such statements may well be improper in the factual framework of another case, we review claims of prosecutorial misconduct in the context of each specific trial and, considering Lipsey's trial as a whole, these arguments do not constitute misconduct.

V.    Cumulative Error

Lipsey further asserts that cumulative error requires reversal. When numerous evidentiary errors occur, a new trial may be necessary even if the errors

construed individually were not sufficient for a new trial. State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). When there is overwhelming evidence of the defendant's guilt, cumulative errors do not require reversal. In re Pers. Restraint of Cross, 180 Wn.2d 664, 691, 327 P.3d 660 (2014). In light of our conclusion that the various issues raised by Lipsey did not constitute error, there was no cumulative error.

VI.     Sentencing

Finally, Lipsey asserts the sentencing court failed to meaningfully consider his youth as a potentially mitigating factor and that the State failed to establish Lipsey's prior convictions by a preponderance of the evidence. We need not review these challenges because the State properly concedes that Lipsey is entitled to resentencing based on State v. Blake. 197 Wn.2d 170, 481 P.3d 521 (2021). Lipsey is free to raise his sentencing arguments with the trial court.

Remanded for resentencing, otherwise affirmed.

WE CONCUR:

Andrus, A.C.J.