**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 85199-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| MICHAEL LEE DUDLEY, | UNPUBLISHED OPINION |
| Appellant. | |

MANN, J. — Michael Dudley was convicted of two counts of murder in the second degree. Dudley appeals and makes several arguments, including that the trial court erred by denying his motion to dismiss under CrR 8.3, denying his motion to suppress evidence under CrR 3.6, and excluding other suspect evidence. Dudley also argues that the prosecutor committed misconduct during voir dire and improperly used his silence against him at trial.

We remand to strike the victim penalty assessment (VPA) and revise the total amount of legal financial obligations (LFOs). We otherwise affirm.

I

On June 19, 2020, teenagers at Alki Beach Park found a suitcase that contained dismembered human remains. An autopsy revealed the remains belonged to Austin

Wenner and Jessica Lewis. On June 22, 2020, more human remains were discovered in a suitcase recovered from the Duwamish River. The medical examiner confirmed those remains also belonged to Wenner and Lewis.

Before their deaths, Wenner and Lewis were in a romantic relationship and lived in Burien at the home of Michael Dudley. On August 18, 2020, police obtained a search warrant for Dudley's residence and vehicles.

During an interview with police, Dudley denied any involvement in the murders and confirmed that the couple had stayed with him during COVID in the "blue room." A police search of Dudley's home revealed bullet holes and blood in the blue room.

Dudley was charged with two counts of murder in the second degree while being armed with a handgun. A jury found Dudley guilty on both counts. The trial court sentenced Dudley to 280 months on each count to be served consecutively.

Dudley appeals.

II

Dudley argues the trial court abused its discretion by denying his CrR 8.3 motion to dismiss the case.[1] Dudley asserts the State's late disclosure of the witness list and the delayed crime lab results were government mismanagement that resulted in prejudice to his right to a fair trial. We disagree.

A

Dudley was arraigned on September 8, 2020. Because of COVID, in-person trials were suspended in November 2020 through January 11, 2021.

_____

[1] Dudley moved to dismiss under CrR 8.3 several times. He assigns error to and presents argument for only the order on his first motion to dismiss, and so that is the only motion to dismiss we address on appeal. RAP 10.3(a).

The State submitted evidence to the crime lab in March 2021. On March 25, 2021, Dudley moved to compel discovery from the crime lab. At the hearing on the motion, Dudley asked the trial court to set a hard deadline for the crime lab but did not specify which evidence should be prioritized. The State noted that some discovery had been disclosed to Dudley, such as the photographs from the search of Dudley's house, the first crime scene investigation report involving the cars searched at Dudley's property, and the second crime scene investigation report which included an inventory of the evidence collected during the search. The State explained that the evidence at the crime lab was "in the [queue]" and the lab was aware of the trial date but that there were many cases in the queue, some with cause numbers older than 2020. The State proposed working with Dudley to designate items for priority testing.

The State sought a continuance because of outstanding discovery and an approaching trial date of April 28, 2021. Dudley's counsel also asked for a continuance, over his objection. The trial court found good cause to continue the case under CrR 3.3(f)(2) and set the next omnibus hearing for May 28, and a trial date of June 28, 2021. At that time, the CrR 3.3(b) time for trial expiration date was July 28, 2021.

At the May 28, 2021 omnibus hearing, the State explained there was still outstanding discovery and many items pending testing at the crime lab. The State explained that the crime lab was figuring out which cases to prioritize out of the many that were pending and that this case had not been assigned yet. Noting that Dudley had been in custody for nine months, Dudley's counsel pointed to the discovery delays and requested a continuance over Dudley's objection. Dudley asked the trial court to order the lab to indicate when testing would be done. The trial court declined to order

the lab to do something absent the appropriate process such as defense presenting a motion for an order to show cause. The trial court granted the continuance under CrR 3.3(f)(2) and set a new trial date of August 23, 2021. At that time, the CrR 3.3(b) time for trial expiration date was September 22, 2021.

At the July 30 omnibus hearing, the State reported that the items Dudley prioritized had been separated out by the lab and that testing would be completed in about two weeks. The State requested another omnibus hearing to account for this testing. Dudley's counsel noted that he was "ready to go to trial on the discovery that we have received." The trial court scheduled the omnibus hearing for August 19, 2021.

At the August 19, 2021 omnibus hearing, Dudley moved to dismiss under CrR 8.3(b). Dudley argued governmental mismanagement justified dismissal or the suppression of evidence because of the State's failure to provide discovery, the failure to provide a witness list, late and duplicative discovery, and a delay in the lab to return discovery.

The same day Dudley's counsel reiterated he was ready to go to trial. He noted that the State had turned over 400 pages of discovery on August 10 but that much of it was duplicative and did not include the crime lab results or a witness list. The State explained that it duplicated some discovery because to provide new portions of the police reports the entire lot had to be rerun to keep the pagination. The State added that the names of all the witnesses and their statements were already disclosed to Dudley, but agreed to provide Dudley with a pared down list.

The trial court noted Dudley's motion to dismiss filed that morning and that the State would have an opportunity to respond before a ruling was made. The trial court

-4-

explained that it could not address discovery issues in general terms and requested Dudley provide explicitly what had been asked for and received or not received, and to set forth a precise remedy other than dismissal. The trial court ordered the parties to provide witness lists by August 27. The trial court also set a new trial date of September 13.

Following the August 19 omnibus hearing, Dudley replied to the motion to dismiss and listed the following outstanding discovery other than the delayed lab results: search warrants, affidavits, or supporting documentation, and information on Kimberly White. Dudley also listed the following discovery as being recently disclosed on August 23 or 24: police reports from the Duwamish River site which listed more witnesses, a complete CIR report from Detective James Cooper, information regarding Leon's prior arrest, some information from Jennifer Leon's flip phone, and redacted public records disclosure requests.

At the hearing on August 27, 2021, the parties addressed the motion to dismiss. Dudley pointed to three search warrants that they received the day before that included new information from forensic anthropologist Kathy Taylor: "This event took a very long time and would leave a very large blood and evidence scene." Dudley explained that Dr. Taylor had recently died and so the there was no way to interview her about something that "is vital to our case." The State also provided a witness list and Dudley admitted that there were no new witnesses. Dudley cited to State v. Brooks, 149 Wn. App. 373, 203 P.3d 397 (2009), and argued he was prejudiced by these late disclosures and the outstanding discovery from the crime lab.

The State acknowledged that the failure to turn over the search warrants was an oversight, but argued it did not reflect a pattern of lack of response to Dudley's requests. The State pointed to all of the discovery that was disclosed beginning in September 2020. The State conceded that it could not explain why the CIR report took as long as it did, but explained that much of the information in the report was already disclosed to Dudley. The State argued that the delay at the crime lab was caused in large part by COVID and ongoing staffing issues, but that results on the priority items were expected mid-September. The State argued that the majority of evidence had been disclosed.

The trial court found that Dudley failed to demonstrate prejudice and that the issues raised by Dudley could be addressed by a continuance. While some discovery had been delayed, COVID was an extraordinary circumstance contributing to the delay in obtaining crime lab testing results. Lastly, the trial court noted that the discovery requested by Dudley had since been provided. The trial court denied the motion.

Dudley began requesting interviews on August 27.

B

We review a "trial court's decision to deny a motion to dismiss under CrR 8.3 for abuse of discretion, that is, whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons." State v. Kone, 165 Wn. App. 420, 433, 266 P.3d 916 (2011), as amended (Dec. 27, 2011). A discretionary decision is manifestly unreasonable or based on untenable grounds "if it results from applying the wrong legal standard or is unsupported by the record." State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017).

CrR 8.3(b) states:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

Dismissal under CrR 8.3(b) is an extraordinary remedy. State v. Rohrich, 149 Wn.2d 647, 658, 71 P.3d 638 (2003). The party seeking relief must show misconduct by a preponderance of the evidence, but need not prove bad faith on the part of the prosecutor. Salgado-Mendoza, 189 Wn.2d at 431. The movant also bears the burden of showing prejudice. Salgado-Mendoza, 189 Wn.2d at 431. To meet this burden, the movant cannot rely on speculative or general allegations of prejudice; they must show actual prejudice to their right to a fair trial. Salgado-Mendoza, 189 Wn.2d at 431.

1

"Violation of the State's discovery obligations can support a finding of governmental misconduct." Salgado-Mendoza, 189 Wn.2d at 429. The prosecutor has an ongoing obligation to disclose discoverable information and must inform the court if efforts to do so are unsuccessful. CrR 4.7; Salgado-Mendoza, 189 Wn.2d at 434. "Misconduct occurs when the prosecutor 'inexcusably fails to act with due diligence,' resulting in material facts not being disclosed 'until shortly before a crucial stage in the litigation process.'" Salgado-Mendoza, 189 Wn.2d at 433 (quoting State v. Price, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)). Due diligence requires more than the absence of bad faith. Salgado-Mendoza, 189 Wn.2d at 434.

Dudley asserts government mismanagement because the State failed to timely provide a witness list. Dudley argues late disclosure of the witness list was sufficient to

show mismanagement. In support of his argument, Dudley relies on State v. Stephans, 47 Wn. App. 600, 604, 736 P.2d 302 (1987) and Sherman, 59 Wn. App. 763, 801 P.2d 274 (1990).

In Stephans, the trial court ordered the State to provide a witness list by a certain date, a date which the State proposed. 47 Wn. App. at 601. The trial court also ordered examination of the child victims. The State violated both orders and, following several hearings and two speedy trial waivers, the trial court granted Stephans's motion to dismiss. Stephans, 47 Wn. App. at 602-03. On appeal, Division Two of this court agreed that dismissal was appropriate but clarified, "[t]he State's failure to supply a formal witness list was symptomatic of the State's poor management of this case. Even so, we would be inclined to hold that dismissal was too drastic a remedy but for the State's conduct concerning the court's order for evaluation of the child witnesses." Stephans, 47 Wn. App. at 604.

In Sherman, the trial court granted dismissal based on the State's failure to produce IRS records, its late amendment of the information, its late motion to reconsider the omnibus order, and its attempt to expand the witness list on the day of trial. 59 Wn. App. at 768. On appeal, the State argued dismissal was unwarranted and that it had attempted in good faith to obtain the IRS records. Sherman, 59 Wn. App. at 768-69. This court disagreed:

> The State's failure to produce the IRS records, in and of itself, is a sufficient ground on which to affirm the dismissal. In the April 14 omnibus order, the State agreed to undertake production of the IRS records of the complaining witness. In spite of this agreement, the State failed to produce the records, and then waited until the day after trial was to have begun to seek reconsideration of the order.
> . . . .

> Here, the speedy trial expiration date had been extended a total of seven times, and was scheduled to expire again on the day the case was dismissed. To require Mead to request a continuance under these circumstances would be to present her with a Hobson's choice: she must sacrifice either her right to a speedy trial or her right to be represented by counsel who had sufficient opportunity to prepare her defense.

Sherman, 59 Wn. App. at 768-69.

Here, the trial court ordered the State to provide a witness list by August 27. Unlike in Sherman and Stephans, the State in this case provided the witness list before the court ordered deadline. Even if we considered the State's disclosure to be late, Stephans suggests that dismissal is too drastic a remedy for a late disclosure without something more. Both Stephans and Sherman involved circumstances beyond the late disclosure which supported dismissal for mismanagement. Dudley points to the timing of when he received the CIR, the search warrants, and information on Leon. But that discovery was provided to Dudley more than two weeks before the trial date. The State complied with the trial court's orders regarding discovery, and there was no day before or morning of trial disclosure. And unlike Sherman, Dudley was not up against the speedy trial expiration date. Dudley fails to establish that the disclosure of the witness list amounted to government mismanagement.

Dudley points to the delayed lab results and asserts that COVID does not excuse mismanagement, especially where a resource issue already existed and COVID measures had been in effect for nearly a year. Dudley relies on Salgado-Mendoza, and State v. Wake, 56 Wn. App. 472, 783 P.2d 1131 (1989).

In Salgado-Mendoza, the State provided a list of nine potential toxicologists five months before trial. 189 Wn.2d at 425. Two weeks before trial, Salgado-Mendoza

-9-

requested the State identify which toxicologist it intended to call. The State did not do so until the morning of trial and Salgado-Mendoza argued mismanagement. The State argued the late disclosure was not misconduct because it tried to comply and the delay resulted from staffing and resource issues at the lab. Salgado-Mendoza, 189 Wn.2d 433. Our Supreme Court disagreed and noted that the State had made no attempt to narrow the list in the five months leading up to trial even where three of the witnesses were on maternity leave and were clearly unavailable. Salgado-Mendoza, 189 Wn.2d at 434-35. Simply pointing to issues at the lab after the fact does not satisfy the State's obligation; thus, the late disclosure constituted mismanagement. Salgado-Mendoza, 189 Wn.2d at 434-35. But the court then agreed with the trial court that Salgado-Mendoza failed to demonstrate actual prejudice caused by the late disclosure. Salgado-Mendoza, 189 Wn.2d at 438-40.

In Wake, the State sought a continuance the day before trial because the expert witness from the crime lab was not available. 56 Wn. App. at 472. Wake objected and argued the State had notice two weeks prior that the expert was unavailable and it had taken no action. Wake, 56 Wn. App. at 473. The trial court granted the continuance, extending the trial well beyond the speedy trial limit, noting the increased crime rate and demand on the lab and ruled there was no prejudice to Wake. Wake, 56 Wn. App. at 473-74. On appeal, Division Three of this court disagreed and reasoned "[i]f congestion at the State crime lab excuses speedy trial rights, there is insufficient inducement for the State to remedy the problem." Wake, 56 Wn. App. at 475. The court held "this was not an unavoidable circumstance beyond the control of the State" and pointed to the State's

failure to issue a subpoena—a critical factor in granting a continuance. <u>Wake</u>, 56 Wn. App. at 475-76.

The State's inaction or lack of due diligence in <u>Wake</u> and <u>Salgado-Mendoza</u> is distinguishable. The State was in contact with the crime lab, it relayed to the trial court why testing was delayed, and it proposed to work with Dudley to designate evidence for priority testing. The priority evidence was designated by the July 30 hearing and the State was told testing would be completed in two weeks, well ahead of the trial expiration date of September 22. There was no last-minute disclosure or motion like in <u>Salgado-Mendoza</u> and <u>Wake</u>. Dudley fails to persuade that the inadequate reason for delay offered in <u>Wake</u>, is equivalent to the unique and widespread issues caused by COVID. A continuance is an appropriate remedy for discovery violations. <u>See</u> <u>State v. Coleman</u>, 54 Wn. App. 742, 775 P.2d 986 (1989) (holding the State's delay was insufficient grounds for a dismissal).

2

Dudley also fails to show actual prejudice to his right to a fair trial. First, Dudley asserts he was prejudiced by the delayed witness list because he was forced to guess who would be called by the State and that it was impossible to prepare from a list of 62 witnesses by the speedy trial deadline of September 22.

"In the dismissal context, a defendant is prejudiced when delayed disclosure interjects 'new facts' shortly before litigation, forcing him to choose between his right to a speedy trial and to be represented by an adequately prepared attorney." <u>Salgado-Mendoza</u>, 189 Wn.2d at 432. "[L]ate disclosure of material facts can support a finding of actual prejudice." <u>Salgado-Mendoza</u>, 189 Wn.2d at 432. Accordingly, Dudley "must

-11-

articulate how the late disclosure materially prejudiced his defense." Salgado-Mendoza, 189 Wn.2d at 436.

In Brooks, the State failed to provide discovery required under CrR 4.7 before the defendants' omnibus hearings. 149 Wn. App. at 383, 386. The State did not provide any discovery, including the names and addresses of its witnesses or any witness statements, before the first scheduled hearing date. Brooks, 149 Wn. App. at 386. The State also failed to make its police file available according to local practice, it failed to issue subpoenas, and it repeatedly dumped discovery the morning of rescheduled hearings, forcing more continuances. Brooks, 149 Wn. App. at 386. Division Two of this court concluded that the "delayed and missing discovery prevented defense counsel from preparing for trial," and affirmed the trial court's finding of prejudice. Brooks, 149 Wn. App. at 390-91.

Brooks is distinguishable. Dudley received discovery and his counsel told the trial court he was prepared for trial. The State provided the bulk of discovery between September 2020 to April 2021. Dudley focuses on the lab results and the witness list. But Dudley did not request any witness interviews until August 27 when his motion for dismissal was denied, even though he knew of all 62 potential witnesses and admitted there was no surprises on the pared down list. Lab results were anticipated to be received before trial. At the hearings below, Dudley could not articulate actual prejudice caused by the timing of the disclosure of the witness list or the delayed lab results.

Second, Dudley focuses on the timing of disclosure of the CIR report, the search warrants, and information from Leon and argues that the cumulative effect of these delayed disclosures prevented him from preparing a defense in time for trial. But

-12-

Dudley fails to explain how he was prevented from preparing for trial. Dismissal is an extraordinary remedy and while delayed discovery can warrant dismissal under certain circumstances, it does not require dismissal.

Dudley asserts that he was forced to choose between a speedy trial and prepared counsel. But Dudley's counsel twice said he was prepared to go to trial. And there is no constitutional mandate that a trial be held within 60 days of arraignment.[2] State v. Terrovona, 105 Wn.2d 632, 651, 716 P.2d 295 (1986).

Also, CrR 3.3(h) provides, "No case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution." This court has held that "[t]he plain and unambiguous language of CrR 3.3 prohibits dismissal of a case under CrR 8.3(b) for violation of a defendant's time-to-trial rights under CrR 3.3 unless a defendant can show a violation of CrR 3.3, a statute, or the state or federal constitution." State v. Kone, 165 Wn. App. at 436. Further, "CrR 3.3(b) provides the exclusive means to challenge a violation of the time-to-trial rule." Kone, 165 Wn. App. at 437. Lastly, CrR 3.3(f)(2) also provides that a motion for continuance "by or on behalf of any party waives that party's objection to the requested delay." Dudley has not asserted a specific violation of CrR 3.3, and Dudley's counsel sought the majority of continuances.

Dudley fails to establish the discovery delays amounted to government mismanagement or that he suffered actual prejudice. Thus, the trial court did not abuse its discretion by denying Dudley's CrR 8.3 motion to dismiss.

---

[2] CrR 3.3 provides the time-for-trial rules and includes a list of circumstances that may extend the trial date.

III

Dudley argues the State committed prosecutorial misconduct during voir dire by misstating the law and improperly previewing the facts of the case. We disagree.

A

During voir dire, the trial court gave each panel of jurors an instruction on reasonable doubt as follows: "[t]he defendant is presumed to be innocent. The presumption of innocence continues throughout the entire trial. The presumption means that you must find the defendant not guilty unless you conclude at the end of your deliberations that the evidence has established the defendant's guilt beyond a reasonable doubt."

To panel 1, the prosecutor explained reasonable doubt as, "you have to presume Mr. Dudley to be innocent at this point in time until we convi—we present you enough evidence to—to prove him guilty beyond a reasonable doubt." The prosecutor then asked jurors in panel one whether they presumed Dudley innocent at that point in time.

To panel 2, the prosecutor stated the "defendant is presumed innocent until the State introduces enough evidence to prove him guilty beyond a reasonable doubt."

To panel 3, the prosecutor stated, "you have to presume Mr. Dudley is innocent until the State introduce[d] enough evidence to prove him guilty beyond a reasonable doubt."

The prosecutor told prospective jurors in panel 1 that questions would be asked randomly to hear from them about "what kind of evidence you wanna see." To juror 65 the prosecutor asked: "[l]et me ask you something else Juror No. 16 mentioned. I think

-14-

you talked a little bit about is the weapon, right? The weapon that killed these people.

Do you think you have to have the weapon[?]"

To panel 2, the prosecutor posed similar questions to specific jurors about the

evidence that jurors would like to see. The prosecutor then asked the entire panel the

following question:

> And what I want . . . to do is kind of ask that question of everybody, which is, Hey, if I don't answer every question for you, but I answer enough question[s], you could convict someone of a crime beyond a reasonable doubt. How many people feel like that's—that's okay for them? Like, Hey, you may not have—you may not know every [detail] of what happened, but as long as you provide enough details to show that Mr. Dudley killed these individuals, that's enough for you to convict? Can you raise your hand if you feel that that's okay?

Dudley objected to him being used as the example:

>     MR. BARSHIS: Your Honor, I'm going to object to continuing to use Mr. Dudley as the example to convict.
>     THE COURT: Overruled.
>     MR. LEE: I'm sorry, everyone. We had to sort of—yeah. Can you raise your hand if you feel like even if I don't answer every question you have, but I answer enough of your questions to show that Mr. Dudley killed these individuals, that's enough for you to convict? Like, I don't . . . show you everything that happened, but I answer enough to show that he did it, you . . . can convict.

The prosecutor continued this line of questioning to panel 3. To juror 168 the

prosecutor asked:

> I'm just kinda getting a feel for what you think you need to see to get there kind of things. Let me ask the question in a slightly different way. Let's say at the end of the trial, right? I prove to him to you that Mr. Dudley committed the murders. But I haven't answered all of your questions about what happened. Would you have any problems convicting him of the murder, even though you still have questions about some of the peripherals of what happened?
>     MR. BARSHIS: Your Honor, I'm going to object to this line of questioning about whether or not they could convict Mr. Dudley at this

point, essentially having to make an opinion as to Mr. Dudley at this point, using him as the example continually.

Outside the presence of the prospective jurors the court told the prosecutor to pose its questions in a less detailed manner:

> Well, my concern, I think, is it's not exactly the same as Mr. Barshis, but I guess if I could state it kind of broadly, I think everybody here knows that the purpose of voir dire is not to try your case to these jurors.
> It's to see if you can get a fair and impartial jury to hear this case. And the thing is, some of these questions are so detailed that I'm—I'm sort of wondering if we're in—if we're seeing the trees and not the forest. And I think it would be helpful and perhaps assuage some of the defense's concerns if we could kind of expand the scope, and you can make sure your questions are framed, you know, not so specifically. Because then it seems more like you are trying your case to them, and more, you know, are you going to be fair and impartial in this case?
> So if you can approach your questioning with that goal in mind, I think a lot of these concerns will fall by the wayside.

B

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). "'If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015) (quoting State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). If "the defendant failed to object, 'the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not

-16-

have cured the resulting prejudice.'" Allen, 182 Wn.2d at 375 (quoting Emery, 174 Wn.2d at 760-61).

"As a quasi-judicial officer representing the people of the State, a prosecutor has a duty to act impartially in the interest only of justice." State v. Warren, 165 Wn.2d 17, 27, 195 P.3d 940 (2008). "A prosecuting attorney commits misconduct by misstating the law." Allen, 182 Wn.2d at 375. In State v. Reed, 168 Wn. App. 553, 578, 278 P.3d 203 (2012), the defendant asserted that the prosecutor engaged in incurable prejudicial misconduct by stating in rebuttal argument that the presumption of innocence "does last all the way until you walk into that [jury] room and start deliberating." The court concluded that the statement was improper, but that a curative instruction would have neutralized any prejudice. Reed, 168 Wn. App. at 579.

First, Dudley argues the prosecutor misstated the reasonable doubt standard to jurors in panels 1, 2, and 3.

Dudley did not object to any of the three statements by the prosecutor and thus must show the comments were so flagrant an ill intentioned that it resulted in prejudice that cannot be cured by an instruction. Dudley fails to make that showing by simply pointing to the use of "until" rather than "unless." "[R]emarks are not per se incurable simply because they touch upon a defendant's constitutional rights." Emery, 174 Wn.2d at 763. A misstatement of the law requires more. See State v. Venegas, 155 Wn. App. 507, 524, 228 P.3d 813 (2010) (holding the prosecutor committed flagrant misconduct where they argued that presumption of innocence erodes as evidence is heard and at the conclusion of evidence, it no longer exists); State v. Evans, 163 Wn. App. 635, 643-44, 260 P.3d 934 (2011) (holding the prosecutor committed misconduct by stating that

-17-

the presumption of innocence "kind of stops once you start deliberating").  And the trial court provided instruction to each panel on the reasonable doubt standard before the State's comments.

Second, Dudley points to the prosecutor's questions to the jury regarding the evidence as exceeding the scope of voir dire.  He asserts the prosecutor's questions attempted to commit jurors to vote a particular way and to educate prospective jurors to the particular facts of the case.  Dudley cites to out-of-state cases in support.

Voir dire should not be used "'to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.'"  State v. Frederiksen, 40 Wn. App. 749, 752, 700 P.2d 369 (quoting People v. Williams, 29 Cal. 3d 392, 408, 628 P.2d 869, 174 Cal. Rptr. 317 (1981)).  But Washington courts have not elaborated on what actions constitute compelling jurors to commit themselves to vote a particular way.  Other states have addressed similar issues and held that case-specific hypotheticals and commitment questions may be excluded from voir dire.

In Utah, it is improper to use voir dire "as a tool to indoctrinate the jury on a party's argument or bolster anticipated witness testimony."  State v. Williams, 2018 UT App 96, ¶ 37, 427 P.3d 434.  The Court of Appeals of Utah has applied this rule to reverse a conviction where a prosecutor asked questions that were "premised on facts—presented as hypotheticals—that mirrored the actual facts of [the] case."  Williams, 2018 UT App 96, ¶ 39.  For example, "'If a child is touched, and it isn't reported immediately, is that something that we're necessarily going to have physical

evidence of? Does that mean it didn't happen?  No.  Okay.'  Defendant's daughters delayed reporting, and there was no physical evidence of their abuse." Williams, 2018 UT App 96, ¶ 26.

And in Texas, "[a] question based on facts peculiar to the case on trial may be properly excluded if it requires jurors to commit themselves before hearing the evidence of the case." DeLeon v. State, 867 S.W.2d 138, 140 (Tex. App. 1993).  In that case, the question was, "[d]oes anybody think it's too long a period of time to wait before the victim is able to identify the alleged Defendant?  That is between October, November, December, January and those three months is that too long to wait before a victim should be able to identify the Defendant?" DeLeon, 867 S.W.2d at 139.

Here, Dudley objected below so he must show that the questions resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.  Dudley fails to meet that burden.  Unlike the cases in Utah and Texas, the prosecutor here did not use particular facts of the case and ask which way the jury would vote.  Instead, the questions were about whether prospective jurors would consider circumstantial evidence generally.  And Dudley fails to persuade that the prosecutor's use of Dudley's name when asking questions was so prejudicial it affected the verdict.  The jurors knew Dudley's name and that he was the defendant.

Dudley fails to establish the prosecutor's actions were improper and prejudicial. Thus, the prosecutor did not commit misconduct.

IV

Dudley argues the warrant for his cell phone records was overbroad because the affidavit did not establish probable cause to obtain location data on June 18 and19 and

thus the location data should have been suppressed. He contends the affidavit had to show that Dudley's phone was used during that time and at a location that was not his residence.

In contrast, the State argues the crime for which probable cause was needed was the murders, not the disposal of the bodies on or around June 18 to 19 and so police were not required to show probable cause for Dudley's location on those dates. We agree with the State.

A

The warrant affidavit describes the investigation beginning on June 19, 2020, when the suitcase was discovered on Alki Beach. The affidavit describes the discovery of another suitcase containing human remains in the Duwamish River on June 22, 2020. After the remains were identified as Wenner and Lewis, detectives learned from Wenner's mother that Wenner and Lewis had been living at Dudley's residence since December 2019. Wenner's mother provided cell phone numbers for Wenner, Lewis, and Dudley.

Detectives also interviewed Wenner's father who stated that he last saw Wenner and Lewis during the first week of June and that they had made plans to meet the following week but he had not heard from them. Wenner and Lewis's family members stated that they would contact both Wenner and Lewis on Lewis's phone. The affidavit describes obtaining Lewis's phone records which showed that the phone stopped receiving and transmitting on June 9. According to the records, Lewis called Dudley's phone on June 9 around 7:00 p.m. and that call used a cell tower less than a mile from

Dudley's residence. The records also revealed that Lewis and Dudley often communicated by call and text in the weeks before June 9.

The affidavit describes information gathered from Dudley's neighbors who heard gunshots in June. It also describes a witness, J.L. (Leon), who met Dudley through friends and she described seeing a body at Dudley's house on the evening of June 9. She told detectives that when she saw Dudley that night, his glasses were broken and he had scratches on him. She described seeing a bloody hand sticking out of a pile of clothes in one of the bedrooms and when she told Dudley about it he asked to take her somewhere because he needed "to clean up a mess." She said she witnessed Dudley laying out large pieces of plastic on the basement floor. Leon described seeing shell casings and ammunition in the basement and bullet holes in the upstairs bedroom. When detectives asked Leon whether she questioned Dudley about what happened, Leon said Dudley told her "let's just put it this way, his gun misfired and mine didn't." The affidavit explains that Leon offered her flip phone to police which contained photos of the bedroom.

The affidavit describes information from another witness who frequented Dudley's house and who met Wenner and Lewis about three times, K.W. (White). White had a room and a key at Dudley's house. White said she called Dudley and asked to come over to use his shower and he told her it was not a good time. White described visiting Dudley's residence anyway and seeing garbage bags in the back of Dudley's truck which emanated a foul smell. White stated she asked Dudley about Wenner and Lewis and Dudley responded that she did not have to worry about them anymore.

-21-

The affidavit describes an interview with B.G., an acquaintance of Dudley who had been to Dudley's house. B.G. stated that Dudley showed her photos on his phone of a dismembered body.

The affidavit describes recovering Dudley's phone during the search of Dudley's vehicle at the time of his arrest on August 19 and he confirmed the phone was his. The affidavit requested the phone records from June 9 to June 19 "because the records from those dates will provide location information at the relevant times and the times in between." The affidavit also requested records from May 26 to August 20 to determine the typical pattern of use before the murder and to gather location information that may lead to video surveillance or additional witnesses who were contacted after the murder. The warrant authorized the search of the phone records for the following:

- Subscriber or registration account information

- Linked or associated accounts

- Device identifying information

For the date range of May 26 to August 20 the following:

- Usage information

- Positioning information

- Physical address of cellular antenna towers

- Internet connection logs and records

B

We review the issuance of a search warrant for an abuse of discretion. State v. Maddox, 152 Wn.2d 499, 509, 98 P.3d 1199 (2004). We review de novo the trial court's probable cause and particularity determinations on a motion to suppress. State v.

-22-

Keodara, 191 Wn. App. 305, 312, 364 P.3d 777 (2015) (citing State v. Higgs, 177 Wn. App. 414, 426, 311 P.3d 1266 (2013)).

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Constitutional particularity requires a search warrant to "be sufficiently definite so that the officer executing the warrant can identify the property sought with reasonable certainty." State v. Stenson, 132 Wn.2d 668, 691-92, 940 P.2d 1239 (1997). The particularity required in a search warrant depends "on the nature of the materials sought and the circumstances of each case." State v. Perrone, 119 Wn.2d 538, 547, 834 P.2d 611 (1992). Probable cause "requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched." State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). A warrant is overbroad if it fails to describe with particularity items for which probable cause exists to search. State v. Maddox, 116 Wn. App. 796, 805, 67 P.3d 1135 (2003).

Article I, section 7 of the Washington Constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." It "provides greater protection to individual privacy rights than the Fourth Amendment," and it "'recognizes an individual's right to privacy with no express limitations.'" State v. Betancourth, 190 Wn.2d 357, 366, 413 P.3d 566 (2018) (quoting State v. Winterstein, 167 Wn.2d 620, 631, 220 P.3d 1226 (2009)). Washington courts have recognized that the search of "electronic storage devices gives rise to heightened particularity concerns." Keodara, 191 Wn. App. at 314. Thus, a "mere possibility" of finding records

of criminal activity does not establish the required nexus between criminal activity and the electronic storage devices to be searched. Keodara, 191 Wn. App. at 316.

A warrant targeting a cell phone must be "carefully tailored to the justification to search" and it must be "limited to data for which there was probable cause." State v. McKee, 3 Wn. App. 2d 11, 29, 413 P.3d 1049 (2018), rev'd on other grounds 193 Wn.2d 271, 438 P3d. 528 (2019). For example, a warrant may contain temporal or topical limits on the information officers can search for and seize. See McKee, 3 Wn. App. 2d at 29 (holding a warrant unconstitutional where it allowed police to search with no temporal or other limitation).

In Keodara, the court held that a warrant "failed to satisfy the Fourth Amendment's particularity requirement" where it authorized an extensive search of a defendant's phone after police suspected him of assault, drug dealing, and unlawful firearm possession. 191 Wn. App. at 317. The court reasoned that "[t]here was no limit on the topics of information for which the police could search," and that the warrant did not "limit the search to information generated close in time to incidents for which the police had probable cause." Keodara, 191 Wn. App. at 316.

In State v. Denham, 197 Wn.2d 759, 764-65, 489 P.3d 1138 (2021), where the underlying crimes were second degree burglary and first degree trafficking in stolen property, a warrant authorized seizure of five months of phone records without limitation. Although the breadth of the warrant was not challenged on appeal, the State acknowledged "correctly, that this was overbroad both in time and scope." Denham, 197 Wn.2d at 764. In any event, the court held the affidavits supported that Denham had a phone with him when he committed the burglary which supported the inference

that evidence of the crime would be found in the location data.  Denham, 197 Wn.2d at 770.

Dudley relies on Denham and argues there is nothing in the affidavit linking the cell location data to discovery of the bodies.  Dudley also cites Keodara and argues the date range was not properly narrowed.  But the information in the affidavits had to link the cell location data to the murders—not disposal of the remains.  The affidavit as a whole provides probable cause that Dudley was involved in the murders.  It alleges that the phone belonged to him and that he had the phone around the time of the murders.  It also alleges that photos of the dismembered bodies were shown on his phone one to two weeks before the story broke of the remains being found.  An inference can be made that evidence of the crime would be found in the cell location data, particularly around the date of the murder and dismemberment which occurred sometime between June 9 and when the remains were recovered on June 19.  An inference can be made that evidence of the murders would be found in location data from June 18 and 19.

Accordingly, the trial court did not err by denying Dudley's motion to suppress the cell phone records data location information.

V

Dudley argues the trial court's exclusion of other suspect evidence violated his constitutional right to present a defense.  We disagree.

"A criminal defendant has a constitutional right to present a defense consisting of relevant, admissible evidence."  State v. Mezquia, 129 Wn. App. 118, 124, 118 P.3d 378, (2005) (citing State v. Rehak, 67 Wn. App. 157, 162, 834 P.2d 651 (1992)).  But

the threshold question is whether Dudley met his burden to establish proper other suspect evidence which is defined and controlled by its own specific body of case law.

"The standard for relevance of other suspect evidence is whether there is evidence 'tending to connect' someone other than the defendant with the crime. State v. Franklin, 180 Wn.2d 371, 382, 325 P.3d 159 (2014) (quoting State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932)). Essentially, this requires that "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Franklin, 180 Wn.2d at 381. "This inquiry, properly conducted, focuses on whether the evidence offered tends to create a reasonable doubt as to the defendant's guilt, not whether it establishes the guilt of the third party beyond a reasonable doubt." State v. DeJesus, 7 Wn. App. 2d 849, 866, 436 P.3d 834 (2019) (citing Franklin, 180 Wn.2d at 381). The defendant bears the burden to establish admissibility of other suspect evidence. State v. Strizheus, 163 Wn. App. 820, 830, 262 P.3d 100 (2011). Hearsay, out-of-court statements offered to prove the truth of the matter asserted, is inadmissible unless an exception or exclusion applies. ER 802.

Dudley points to the following evidence as being improperly excluded:

- Testimony by Wenner's aunt and her nephew Blanchard that Wenner told them he had problems with "Samoans" and that Wenner found a bullet in Dudley's mailbox with their names on it.

- Testimony by Blanchard that he witnessed Wenner with a rib injury that Wenner told him he was assaulted by Samoans while at Dudley's residence in the blue room.

- Testimony by Root that he witnessed Wenner and Lewis in a panicked state and that Wenner told him about the bullet and that he was assaulted by Samoans, and named one as "Abe."

-26-

- Testimony by Jones that Wenner and Lewis were pistol whipped twice by a Samoan person.

- Testimony by Lewis's aunt that Wenner and Lewis were involved in a check cashing scheme and that Wenner told her about the bullet in the mailbox and that "Bloods" were after him.

- Testimony by Leon that she observed a number of guns at Dudley's residence and that she took the guns to a Samoan associate/boyfriend named Coconut who got rid of the guns. And in the following days, Coconut would go to Dudley's residence for several hours each day.

The majority of the other suspect evidence consists of testimony that is inadmissible hearsay—Wenner's out-of-court statements offered for the truth of the matter asserted. And Dudley conceded no evidence connected Coconut to any assault before the murder or to the alleged check cashing scheme. Dudley also conceded there was no admissible testimony about any actions by "Abe." Thus, the trial court did not abuse its discretion by finding the evidence speculative.

And, while Blanchard's testimony that he witnessed Wenner in pain may be admissible, the explanation of why he was injured is hearsay. Dudley argued it fell within the exception under ER 803(a)(3) which allows a "statement of the declarant's then existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed." But, by its plain language, the rule excludes Wenner's statements about why and how he was injured. Wenner's pain without context does little to help Dudley's defense.

Dudley cites State v. Young, 27 Wn. App. 2d 461, 473, 532 P.3d 629 (2023), and asserts that the right to present a defense can include the right to present evidence that violates an evidentiary rule. In that case, Division Three of this court explained that the

-27-

constitutional right to present a defense can include the right to present evidence in violation of state evidence rules:

> When a state rule results in the exclusion of evidence, the test for determining whether the exclusion violated the defendant's constitutional right is a balancing test, which "weigh[s] the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence."

Young, 27 Wn. App. 2d at 473 (quoting State v. Jennings, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022); see generally Holmes v. South Carolina, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (summarizing several illustrations of "arbitrary" rules that "excluded important defense evidence but that did not serve any legitimate interests).

But neither Young nor Jennings reviews exclusion of evidence based on classic hearsay. Young involved a sustained objection to testimony based on impermissible opinion on guilt and Jennings involved the exclusion of a toxicology report under ER 403 as speculative and confusing. Young, 27 Wn. App. 2d at 469-71; Jennings, 199 Wn.2d at 60. And Dudley fails to persuade that hearsay and the exclusion of such evidence here resulted from an arbitrary state rule that violated his right to present a defense. See also Holmes, 547 U.S. at 326-27 (explaining that the rule regulating the admission of other suspect evidence is widely accepted and is the type of rule that properly allows judges to exclude evidence that is speculative).

And although Dudley argues he was not allowed to present a defense, the trial court allowed Dudley to cross-examine Leon about her actions with Coconut and to present evidence that Wenner and Lewis were seen on June 12. The trial court also allowed Dudley to attack the credibility of the police investigation about not pursuing other leads and suspects.

Because Dudley fails to demonstrate that the other suspect evidence was admissible, he also fails to establish a violation of his constitutional right to present a defense based on excluding that evidence.

VI

Dudley argues the State violated his constitutional rights when it impermissibly commented on Dudley's prearrest silence as substantive evidence of his guilt. Specifically, by pointing to Dudley's silence in the form of not calling the police when he learned Wenner's and Lewis's bodies were discovered.

A

In their opening statement, the prosecutor made the following arguments related to Dudley's failure to call the police:

> He also said that he first heard about Austin and Jessica's deaths from friends and then saw it on TV. When the detectives asked him why he didn't contact the police to indicate that they had been living with him until recently, despite claiming to be good friends with Austin and Jessica, Dudley said, I was waiting for you guys to call me. I figured you'd be right here.
>      . . . .
> So when . . . the detectives pushed him to say, Well, really? Why did you assume that? Why didn't you come forth when the police didn't contact you? He again blamed the police for not making any contact.

The prosecutor also made the following argument in closing:

> But as Detective [Paul] Takimoto points out, after he learns of their death, he never comes forward, right? Let's listen to a little bit about his explanation about this.
>           (WHEREUPON, an audio recording was played.)
>           MR. LEE: So, Mike, when did you find out about Austin and Jessica's death? How did you find out? I think Richie called me and told me. Richie talked to Renee. Renee, did you see it on the news at all? Well, I saw the news after that. Yeah. Okay, well, that is a question. Why didn't you call the police? I was waiting for you guys to call me. I figured you'd be right there when we did call. Why didn't you why don't you call?

There's really nothing to report. I figured you'd be there. Isn't that part of your standard procedure? Yeah, but I'm just kind of sitting there, like, wondering where the hell you guys have been. But you just sat here for the last hour or so talking about how they're good, you're good friends, and you heard what happened to them and how brutal it was.

. . .

MR. LEE: Listen to that. Does he ever give a clear explanation, or is he just diverting from that question about this?

Dudley failed to object to both the opening statements and closing arguments.

B

We "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest, and (2) the error is truly of constitutional dimension." State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "We do not assume the alleged error is of constitutional magnitude." O'Hara, 167 Wn.2d at 98. "We look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." O'Hara, 167 Wn.2d at 98. Accordingly, we must first address whether Dudley's claim implicates a constitutional interest.

Under both the federal and state constitutions, no person may be compelled to be a witness against themselves. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. The State may not exploit a defendant's decision to exercise their constitutional right to remain silent. Doyle v. Ohio, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Washington courts have recognized the right to silence in prearrest situations. In State v. Easter, 130 Wn.2d 228, 241, 922 P.2d 1285 (1996), our Supreme Court held the State may not use a defendant's prearrest silence in response to police inquiries as

-30-

substantive evidence of guilt. See also State v. Burke, 163 Wn.2d 204, 221, 181 P.3d 1 (2008) (holding the State violated the defendant's right to silence when it commented on the defendant ending the interview as evidence of guilt).

Dudley argues his "silence" months prior to his arrest in the form of not calling the police is entitled to protection under the constitution. Dudley cites State v. Keene, 86 Wn. App. 589, 938 P.2d 839 (1997), but that case is distinguishable. In that case, the detective called Keene several times to talk about the case and they scheduled an interview to which Keene did not show. The detective testified that they left several messages "indicating that if I hadn't heard from him by the 22nd I would need to turn it over to the prosecuting attorney's office." Keene, 86 Wn. App. at 592. In closing argument, the prosecutor pointed to that testimony and argued "it's your decision if those are the actions of a person who did not commit these acts." Keene, 86 Wn. App. at 592. Division Two of this court held the comment was improper. Keene, 86 Wn. App. at 594.

Here, Dudley's silence or rather inaction does not implicate a constitutional interest. His prearrest silence was not exercised when confronted by police or in response to police questioning. And during his interview with police he did not remain silent, he responded to their questions. And when a "defendant does not remain silent and instead talks to police, the state may comment on what he does not say." State v. Clark, 143 Wn.2d 731, 765, 24 P.3d 1006 (2001). Accordingly, Dudley may not raise this argument for the first time on appeal.

Thus, we decline to review Dudley's claim of error under RAP 2.5(a).

VII

Dudley argues that remand is necessary to strike the VPA and the DNA collection fee because he is indigent and recent legislation prohibits imposing the fees. The State does not dispute Dudley's indigency and does not object to striking the VPA and notes there was no DNA fee imposed even though the total obligation reads "$600.00 plus restitution to be determined." The State is not opposed to correcting the total amount of financial obligations to read "$0 plus restitution to be determined." We accept the State's concession.

In 2023, the legislature added a subsection to RCW 7.68.035 that prohibits courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). LAWS OF 2023, ch. 449, § 1. In addition, the legislature eliminated the DNA fee entirely. LAWS OF 2023, ch. 449, § 4. Our courts have held that recent amendments to statutes governing LFOs apply to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

VIII

Dudley raises three issues in a statement of additional grounds (SAG).

A

First, Dudley argues the State committed misconduct by offering exhibits that were materially different from those provided in discovery and that the trial court abused its discretion by admitting the exhibits into evidence.

Originally, Dudley was aware of four maps drawn using GeoTime.[3]  The State decided to not use those maps and instead offered maps that were plotted using Google Maps and inputting the data from the call data records (CDR).  As described by the trial court:

> Each of the new exhibits have various pages to include individual CDRs in the form of a tack with lines drawn to indicate distances from that tack to some other relevant location. In addition, each new proposed exhibit contains a "summary" map that displays all of the individual CDR tacks from the other maps in that same exhibit plotted on to one google map. These four exhibits have been denominated exhibits 103, 104, 105, and 109 for identification.[4]

Ultimately, the exhibits were not admitted.  And the summary maps attached to each exhibit were excluded as hearsay, but the court clarified that the map could be used during Detective Ashley Fitzgerald's testimony.

The excluded summary or compilation map was later used as an aid during Detective Fitzgerald's testimony.  Dudley objected but the trial court ruled the excluded map could be used to aid Detective Fitzgerald with drawing an accurate map.

This court reviews evidentiary rulings for an abuse of discretion and "will not reverse the trial court's decision unless . . . no reasonable judge would have made the same ruling."  State v. Burke, 196 Wn.2d 712, 741, 478 P.3d 1096 (2021).  An expert witness may use hearsay exhibits during testimony under certain conditions.  According to ER 703, an expert can base their opinion on facts or data that are not admissible in evidence if those facts or data are of a type reasonably relied upon by experts in the particular field.  ER 705 allows the expert to testify in terms of opinion or inference and

---

[3] A geo-temporal visual analysis and mapping software used by law enforcement.
[4] Exhibit 109 was a correction of exhibit 105.

give reasons for their opinion without prior disclosure of the underlying facts or data, unless the judge requires otherwise.

Dudley fails to establish the trial court abused its discretion allowing the map to be used during Detective Fitzgerald's testimony.

B

Dudley makes passing assertions of prosecutorial misconduct and argues misconduct in relation to Detective Fitzgerald's testimony about the cell data. To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecuting attorney's conduct was both improper and prejudicial. State v. Weber, 159 Wn.2d 252, 270, 149 P.3d 646 (2006). If the defendant did not object at trial—as is the case here—the issue is waived unless the "prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. Under this heightened standard, the defendant must show that (1) "'no curative instruction would have obviated any prejudicial effect on the jury'" and (2) the misconduct resulted in prejudice that "'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

But Dudley fails to establish that the State's conduct during Fitzgerald's testimony or in closing argument was flagrant and ill intentioned. Otherwise, Dudley's claims are either without merit or are too vague to address. State v. Bluehorse, 159 Wn. App. 410, 436, 248 P.3d 537 (2011).

C

Dudley next argues his constitutional right to a speedy trial was violated.  A criminal defendant is provided the right to a speedy public trial under both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution.  State v. Higley, 78 Wn. App. 172, 184, 902 P.2d 659 (1995).  But Dudley only cites the constitutional provisions and otherwise focuses his argument on the trial court's decisions under CrR 8.3 and 3.3.  We therefore do not address the constitutional argument.  While a SAG need not include citations to the record or legal argument, the appellant must "inform the court of the nature and occurrence of the alleged errors." RAP 10.10(c); State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

Dudley asserts the trial court erred by denying his CrR 3.3 motion to dismiss and that there were no circumstances beyond the control of parties justifying delay.  But much of this argument restates the arguments made by counsel above related to denial of Dudley's CrR 8.3 motion.  Where a SAG contains alleged errors that "have been thoroughly addressed by counsel," they are "not proper matters for [the] statement of additional grounds under RAP 10.10(a).'"  State v. Thompson, 169 Wn. App. 436, 493, 290 P.3d 996 (2012).

Dudley also assigns error to the trial court's decision on September 29, 2022, denying his motion to dismiss, which was not addressed by counsel above.  Essentially, Dudley argues that we should reconsider his prior CrR 8.3 motions to dismiss under the CrR 3.3 time for trial rule and based on Division Three's holding in State v. Denton, 23 Wn. App. 2d 437, 516 P.3d 422 (2022).

Denton, a pre-COVID case, is distinguishable. In Denton, the original trial date was set for December 31, 2018, but was delayed because Denton's court appointed lawyer was in the hospital. At an omnibus hearing on January 29, 2019, the State sought a continuance based on a delay from the crime lab that "generally for rape kits involving DNA . . . best case scenario is somewhere around nine months." Denton, 23 Wn. App. 2d at 444. Defense counsel said it could try the case without DNA and Denton objected to the continuance. Denton, 23 Wn. App. 2d at 444. The trial court continued the trial to June, finding reasonable efforts by the State to get the testing performed. Denton, 23 Wn. App. 2d at 444. At the omnibus hearing in May, the State asked for a continuance based on a "substantial back-up" at the lab and it taking another four to six weeks to complete the testing in response to the State's request to put a rush on it. Denton, 23 Wn. App. 2d at 446. The trial court granted the continuance over Denton's objection, explaining that there was no prejudice to Denton and that "I'd like to see this get moving. But I think we're held hostage by the crime lab." Denton, 23 Wn. App. 2d at 446. There were subsequent continuances requested by Denton's counsel. On appeal, Denton challenged only the two continuances granted at the State's request. Division Three of this court determined the trial court abused its discretion by continuing trial beyond the March 4 deadline based on delays at the lab that were described as "expected and routine." Denton, 23 Wn. App. 2d at 457-58. And there was no record of details explaining the backlog, or the prosecutor's efforts to get around it, or a reasonably short time frame proposed or ordered. Denton, 23 Wn. App. 2d at 458.

Here, unlike in <u>Denton</u>, the continuances and the crime lab delays were caused, in part, by COVID. William Stubbs from the crime lab gave the following reasons for the delay: backlog of rape kits, labor shortages, and COVID. He also testified about the efforts to move the case up the queue, which at the time was about a yearlong wait. While the State did not submit the evidence to the lab until March 2021, the State said it made repeated inquiries to the lab to find out timing and it suggested prioritizing evidence to be tested first. And, unlike <u>Denton</u>, here the continuances were almost exclusively requested by defense counsel. Which means Dudley waived objection to those delays. CrR 3.3(f)(2).

We remand to strike the VPA and to revise the total amount of LFOs. We otherwise affirm.

_____Mann, J._____

WE CONCUR:

_____Feldman, J._____          _____Díaz, J._____